Floyd KOCH; Janice Koch; William D. Lowe; Phyllis Lowe; Colin Wong; Mark Burr; Suzanne Borges; Herman Duran; Walter Hashimoto; Shoge Kimura; Hercules Fini, Damien Chang, Ken Takeda, Bill Parrish, Ken Kemp, James Fong, Yui Yee Fong, F. Allen Whitaker, Bob Lugg, Joe Kimura, Beverly Chinn, Harold Chew, Ken Lee, Charles DiBari, Russell DeBari, Richard Plash, Eddon Duran, Rock Koch, J. William Bace, Don Nusbaum, J. Warren Davis, Larry Peterson, Barbara Peterson, George Riley, Harold Hester, Patricia Hester, Jack Isaacs, Robert Chisholm, Forrest Chioppa, Roy Fong, Alan Joe, Virginia Joe, Henry Nigro, James Ford, James Chen, Robert Lee, James Lau, Morris Fowler, Kay Haa, Chris Hara, Frank Ducato, Winston Lee, Allen Tusting, Marcia Tusting, Enrique Agorio, Inger Agorio, Lilia Buck, Stephen Buck, Ue Ching Ow, Pat Ow, Edward Chan, Pat Chan, Pak Tong Yee, Marshall I. Rothstein, Francoise Rothstein, Tom Drake, F.K. Chin, Sandra Chin, Hayden Evans, Arlene Evans, Phillip Lucas, William Jagger, Delores Jagger, Howard Schwat, Robert I. Longstreth, Barbara J. Longstreth, Jerry Vonder Ahe, William Wong, Doreen Wong, Carl Chen, Ben Hara, Helen Hara, Blair Anderson, John Dailley, Sarah Dailley, Fred Drew, Ruth Drew, Terry Kessler, Leland Smith, Helene Smith, Plaintiffs–Appellants,

v.

Edward J. HANKINS; Robert Chew; Beverly A. Chew; Rodney Chew; Linda A. Chew; Audrey A. Hankins; Carla Patterson; Terry J. Hankins; Bradley L. Hankins; Kerdie J. Hawks; Dean K. Hawks; Rodlin Enterprises, Inc., Carlon Properties, Inc., Kean Financial Corp., Buckingham Financial Corp., Sentinel Financial Corp., Citadel Financial Corp.; Johnson, Hankins, MacDonald, Kimball & Co., Glen MacDonald, Richard C. Clews, Don Kimball, Maxus Management Group, Defendants–Appellees.

No. 89–16005.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1990.

Decided March 21, 1991.

Andrew Wilson, Wilson, Ryan & Campilongo, San Francisco, Cal., for plaintiffs-appellants.

Montie S. Day, Day Law Corp., Oakland, Cal., for defendants-appellees.

Before CHOY, TANG and FLETCHER, JJ.

## OPINION

FLETCHER, Circuit Judge:

The plaintiff-investors ("investors") appeal from the district court's summary judgment that the investments did not constitute securities within the meaning of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The investors likewise seek to appeal the district court's denial of their motion for reconsideration of the summary judgment order in light of *Hocking v. Dubois*, 885 F.2d 1449, 1454 (9th Cir.1989) (en banc), *cert. denied*, — U.S. —, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990). The defendant-promoters ("promoters") have filed a motion to limit the scope of this appeal to review of the summary judgment order since the investors did not file a separate notice of appeal related to the later order denying reconsideration. The promoters also move for sanctions based on the investors' alleged violations of Circuit Rules 28-2.8 and 30-1.4.

## BACKGROUND

The investors are primarily doctors, dentists and their relatives (and corporations formed by them for investment purposes) who invested between $23,000 and $500,000 each in general partnerships formed to purchase land for the production of jojoba. Several of the promoters had been the longtime accountants of a number of the investors. Promoter Beverly Chew, who drafted most of the relevant documents, had been the attorney for investors Koch, Wong and Lowe for a number of years

prior to the time they made these investments.[1] Other defendants are corporations formed by the accountants and lawyer, relatives of the accountants and lawyer, and the accounting firm with which the accountants were affiliated at the time of the investments or with which they had previously been affiliated.[2] The investments were undertaken in part for tax purposes and allegedly were promoted to the accountants' clients on that basis.

The overall investment scheme involved thirty-five different general partnerships, each of which purchased eighty acres of land from "selling corporations" owned by the promoters, which in turn purchased land from a common seller.[3] In all, approximately 2700 acres and 160 investors were involved in the various general partnerships. Although the promoters present the general partnerships as independent entities, the investors assert that the promoters told them at the outset that it was not economically feasible to farm jojoba in eighty-acre parcels; that they never regarded their general partnerships as separate eighty-acre farms but rather as part of a 2700–acre plantation; and indeed that the promoters themselves did not view the general partnerships as separate farms with the capability of operating independently.[4] Prior to the solicitation of investor funds, the promoters arranged for the clearing and levelling of all 2700 acres of the land and the planting of jojoba seed for a predetermined price. Moreover, the Confidential Private Placement Memoranda for the thirty-five general partnerships all specified identically that the general partners would initially employ Franklin W. Rogers as foreman to carry out the onsite farming cultural practices; that two named experts would be consulted as to jojoba planting practices; that the partnership would execute an irrigation lease for a term of five years for an annual rental of $2,800; and that the partnership would purchase from the promoters by bill of sale a supply of jojoba seeds, fertilizer, weed control and other materials at a cost of $300 per acre. In addition, the thirty-five partnerships shared a common field office financed by an administrative fund to which all the partnerships contributed. At a minimum, therefore, whether the eighty-acre partnerships could or were intended to operate independently from the 2700–acre Great Western Jojoba plantation is a disputed question of fact.

Each general partnership was comprised of one operating general partner and a number of general partners. The thirty-five partnership agreements detail identically the rights and responsibilities of the partners. The operating general partners have responsibility for executing the general partners' decisions about the manage-

---

1. Doctors Koch, Lowe and Wong were approached by the promoters to be operating general partners and assist in raising funds for some of the general partnerships. They respectively were officers and directors of Flojanco, Inc., Abacus Investment Services, and CCW Financial Corporation, which acted as operating general partners in fourteen of the thirty-five general partnerships.

2. For the sake of simplicity we refer to the defendants collectively as "promoters" even though their roles may have differed.

3. The investors allege that the selling corporations paid from $1000 to $1600 per acre for the land, which they subdivided and resold to the general partnerships for between $2,000 and $3,500 per acre. They further allege that a double escrow was used so that the promoters expended no money of their own to acquire the land but, rather, used a portion of the money supplied by the investors to pay the promoters'

obligation to the initial seller. The promoters contest these assertions regarding how the land purchase was structured and argue that they were not supported by any evidence in the trial court below. Since these allegations go to the merits of the investors' fraud claims, and are not relevant to the issue before this court, we need not and do not rely on them and therefore need not address whether they were adequately presented to the district court on summary judgment.

4. While the precise structure of the arrangement and the expectations of the parties are disputed, since we assume disputed facts in favor of the nonmoving party when reviewing a grant of summary judgment, we must accept as true the deposition testimony and declarations of the investors that they were told by the promoters that farming jojoba in eighty-acre parcels was economically infeasible and that their investment would be part of a 2700–acre plantation.

ment and control of partnership business.[5] Within each partnership, the general partners have full and exclusive control of the business of the partnership and can take action in that regard only upon a majority vote.[6] Within each partnership, the general partners have the ability to remove any person from a management position by majority vote and have access to the partnership's books and records.

The degree of actual participation by the general partners and operating general partners and its significance to the endeavor is a matter of considerable dispute. The promoters point out that some investors have voted on such partnership business decisions as whether to pay additional assessments to meet operating budgets, a proposed sale of partnership assets in response to an offer by a third party, whether to interplant alfalfa between rows of jojoba, whether to join a marketing cooperative, whether to amend the partnership agreement, water district elections, and whether to stop farming their parcel or section. In addition, some investors have visited the property their partnerships purchased and tested the soil. There are also letters and memoranda in the record from operating general partners and general partners which suggest that the operating general partners paid careful attention to the status of their particular farms and kept the general partners informed in some detail as to the status of particular plots.

The investors argue, on the other hand, that their role was essentially passive. It is undisputed that none of them had any experience in jojoba farming. It appears

that even those investors who nominally held the role of operating general partner usually acted as conduits for materials created by the promoters. The investors assert that the operating general partners did not even generate the pro rata assessments for operating expenses for each general partner. Those figures were determined by the promoters. Finally, the investors assert that any voting they did was largely pro forma in light of their lack of expertise, their inability to devote time to direct participation in the project, and their ability at best to shape decisionmaking only for the eighty acres owned by their particular general partnership. It is even disputed in the record whether, had investors actively exercised decisionmaking regarding the farming of their particular parcels of land, their decisions would have been implemented.[7]

As one might guess from the fact that the parties are now in court, the investments proved less than successful. "The super bean of the future" did not achieve its full potential in this venture. Approximately ninety of the investors brought suit in the federal district court alleging violations of both federal and state law. The district court exercised its discretion to refuse jurisdiction of the pendent state law claims, leaving only the federal securities law claims. The promoters then brought motions for summary judgment on statute of limitations and jurisdictional grounds. The district court, relying heavily on the case of *Matek v. Murat*, 862 F.2d 720, 724–32 (9th Cir.1988), granted the promoters' motion for summary judgment on jurisdictional grounds, holding the invest-

5. In a number of the partnerships a promoter either acted as operating general partner directly or through a corporation formed for that purpose, or performed all of the work required of the operating general partner in exchange for some portion of the fees paid by the partnership for that function. It appears that such arrangements were contemplated from the outset.

6. The partnership agreement provides that
The Partners shall be responsible for all decisions, ... including but not limited to hiring and firing of personnel, determination of the type of crops to be grown, ... the timing of and the manner of fertilization, pruning, thinning, pest and weed control, irrigation, re-

pairs and maintenance on irrigation systems and other equipment, discing and general cultural practices, removal and replacement, capital expenditures, seed purchases, planting, harvesting, storage and sale.

7. Drs. Koch, Lowe and Wong assert in their declarations that the only specific instruction they ever gave the on-site managers in their roles as operating general partners for fourteen of the thirty-five partnerships was to "stop farming" in early 1988. They allege that by June, 1989, when they travelled to the site, there was no difference in growth of the jojoba plants or weed control that would indicate that farming had been ceased on any of the parcels.

ments were not securities within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. The investors filed a timely notice of appeal.

Subsequent to the granting of summary judgment, this court decided en banc the case of *Hocking v. Dubois,* 885 F.2d 1449 (9th Cir.1989). The appeal was therefore remanded on a limited basis to the district court for decision of the investors' Rule 60(b) motion for reconsideration in light of *Hocking.* The district court denied reconsideration. No notice of appeal was filed regarding that order.

## DISCUSSION

■ A district court's summary judgment that investments are not securities is reviewed de novo. *Deutsch Energy Co. v. Mazur,* 813 F.2d 1567, 1568–69 (9th Cir. 1987). We therefore, like the district court, consider the evidence in a light most favorable to the non-moving party (the investors) and determine whether there is any genuine issue of material fact and whether the promoters are entitled to judgment as a matter of law. *Lone Ranger Television, Inc. v. Program Radio Corp.,* 740 F.2d 718, 720 (9th Cir.1984). A district court's denial of a motion for reconsideration pursuant to Rule 60(b) is reviewed for abuse of discretion. *Fiester v. Turner,* 783 F.2d 1474, 1475–76 (9th Cir.1986); *Plotkin v. Pacific Tel. & Tel. Co.,* 688 F.2d 1291, 1293 (9th Cir.1982).

### A. *Scope of the Appeal.*

Because the investors filed no notice of appeal related to the district court's denial of their motion for reconsideration, we do not review that order. As a practical matter, however, such limitation on the scope of the appeal makes no difference; since we review the grant of summary judgment de novo and would only review the denial of reconsideration for abuse of discretion, and since the two orders concern the same question of whether the investment constituted a "security," de novo review of the summary judgment obviates any practical need for review of the order denying reconsideration.

### B. *Whether the Investment Constitutes a "Security".*

In order to make out a claim under the federal securities laws, the investors must demonstrate as a threshold matter that the promoters' alleged misrepresentations were made in connection with the purchase or sale of a security. Both section 2 of the Securities Act of 1933, 15 U.S.C. § 77b(1) (1982) and section 3 of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (1982), define the term "security" to include, *inter alia,* any "investment contract." Since the investments involved in this case do not constitute any of the other types of securities protected by the Acts, the critical threshold inquiry is whether the general partnerships constitute "investment contracts" within the meaning of the Acts.

■ The term "investment contract" has been interpreted by the Supreme Court broadly to reach "[n]ovel, uncommon, or irregular devices, whatever they appear to be ..." *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943). "It embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946) (holding that a combined sale of units of a citrus grove development coupled with a contract for cultivating, marketing and remitting the net proceeds to the investor was an "investment contract"). The Court has consistently expressed the view that "[b]ecause securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975); *Howey,* 328 U.S. at 298, 66 S.Ct. at 1102. Thus, the fact that the investments here are structured as "general partnerships" is not determinative of their status

as securities; rather, we must examine the economic realities of the transactions to determine whether they are, in fact, investment contracts. *Matek v. Murat,* 862 F.2d at 724.

The Supreme Court in *Howey* set out the classic three-part definition of an investment contract: "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person [1] invests his money in [2] a common enterprise and is led to [3] expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298–99, 66 S.Ct. at 1102–03. The Ninth Circuit has held that "the word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract." *SEC v. Glenn W. Turner Enters., Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *Hocking,* 885 F.2d at 1455. Instead, this circuit looks to whether "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.*[8] Here, as in most cases dealing with the *Howey* test, the inquiry revolves around the third, "control," element of the test—whether the investors had an expectation of profits which would be produced in essential part through the efforts of others.

### 1. Scope of Inquiry As to the Control Element of Howey.

▮ In deciding whether investors have raised a genuine issue of material fact as to the third element of *Howey,* we face a threshold question as to what evidence is relevant to that determination: whether the inquiry should focus solely on the formal partnership agreement and the powers it confers on the investors, or whether it should encompass other factors which implicate the investors' practical ability to control their investment. The district court relied on *Matek,* which mandates consideration only of the formal, legal powers of investors. 862 F.2d at 730. We conclude, however, that such reliance on *Matek* was erroneous in light of the subsequent en banc opinion in *Hocking v. Dubois,* 885 F.2d 1449 (9th Cir.1989).

In *Matek* a three-judge panel addressed for the first time in the Ninth Circuit "the issue of whether general partnership interests that are marketed are securities for the purposes of the securities laws." *Matek,* 862 F.2d at 725. The panel rejected the "bright-line" approach articulated in *Goodwin v. Elkins & Co.,* 730 F.2d 99 (3d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984), (holding that no general partnership formed pursuant to the UPA is a security), finding that such a label-oriented approach ignored the "economic reality test." *Matek,* 862 F.2d at 727. The panel likewise rejected the Fifth Circuit's three-prong test set out in *Williamson v. Tucker,* 645 F.2d 404 (5th Cir. 1981), as creating too much uncertainty. It adopted *Williamson's* first prong and expressly rejected the other two prongs, stating that *Williamson* went "too far." *Matek,* 862 F.2d at 728–29.

The Fifth Circuit held in *Williamson* that:

A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or manage-

---

8. The Third, Fifth and Sixth Circuits have adopted this *"Glenn Turner* test." *Goodwin v. Elkins & Co.,* 730 F.2d 99, 103 (3d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984); *Williamson v. Tucker,* 645 F.2d 404, 418 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Odom v. Sla-* *vik,* 703 F.2d 212, 215 (6th Cir.1983) (per curiam). The Supreme Court has also noted the *Glenn Turner* test without expressing a view as to its applicability to the case before it. *Forman,* 421 U.S. 837, 852 n. 16, 95 S.Ct. 2051, 2060 n. 16.

rial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson,* 645 F.2d at 424. According to *Williamson* the critical determination is whether, although "[o]n the face of a partnership agreement, the investor retains substantial control over his investment and an ability to protect himself from the managing partner or hired manager ..., [the investor can demonstrate that] he was so dependent on the promoter or on a third party that he was in fact unable to exercise meaningful partnership powers." *Id.* The *Williamson* opinion made clear that the three factors are not exclusive and that "other factors could ... also give rise to such a dependence." *Id.* at 424, n. 15. *Williamson* likewise specified that the inquiry is not directed to what actually transpires after the investment is made, i.e., whether the investor later decides to be passive or to delegate all powers and duties to a promoter or managing partner; rather, "one would have to show that the reliance on the manager which forms the basis of the partner's expectations was an understanding *in the original transaction.*" *Id.* at 424, n. 14 (emphasis added).[9]

In rejecting the second and third prongs of *Williamson* as creating too much "uncertainty in the area of business investing," *Matek,* 862 F.2d at 729, the panel in *Matek* held that "[t]he proper focus must be the partnership agreement and not how in fact the entity functioned in carrying out its business affairs." 862 F.2d at 731. *Matek* likewise held that "access to information about the investment, and not managerial control, is the most significant factor." 862 F.2d at 728. The promoters urge this panel to follow *Matek* strictly and to look only to the partnership agreement in evaluating whether the investors expected profits through the efforts of others.[10] In the view of promoters (and *Matek*), if the "terms of the agreement provide [the investors] with all the access and ability to protect their investment that the securities laws would otherwise provide," then the investors' interests in the jojoba plantations are not securities. 862 F.2d at 731.

The promoters' reliance on *Matek* is misplaced, however, in light of the subsequent en banc decision in *Hocking,* which cites *Williamson* as "the leading case on the control issue" and expressly adopts and applies all three *Williamson* factors. 885 F.2d at 1460.[11] The *Hocking* opinion clouds the issue of *Matek*'s continuing viability because it cites *Matek* as a case in which the Ninth Circuit "previously adopted *Williamson*'s approach," apparently failing to note *Matek*'s rejection of the second and third *Williamson* factors. *Hocking,* 885 F.2d at 1460. The promoters latch onto this citation and contend that because *Hocking* cites *Matek* with approval and does not overrule or limit its holding, *Matek* remains viable. That position is directly contrary to *Hocking*'s express adoption of all three *Williamson* factors and its

---

**9.** The clear focus in *Williamson* on the investors' expectations at the time of the original transaction rather than on the de facto post-investment conduct of the parties obviates the concern expressed by the promoters that "[a]n interest marketed as a general partnership might be transformed into a security simply because its holder is not diligent or knowledgeable in exercising his rights under the agreement." *Matek,* 862 F.2d at 729. On the contrary, *Williamson*'s approach is entirely consistent with *Matek's* holding that "it is immaterial whether the partnership later fell into a pattern of circumscribed partnership participation ..." *Id.*

**10.** The promoters appear to argue that the panel should not even look to the Placement Memoranda in determining whether the investors ex-

pected profits through the efforts of others. Such a narrow approach is particularly inappropriate in this case where the partnership agreement makes no reference to any of the services being provided by the promoters, or to the sharing of services and equipment by the various partnerships. The economic reality of the investment simply would not be reflected in an evaluation of an 80–acre partnership without reference to the larger plantation.

**11.** *Hocking,* like *Williamson,* recognizes that "under different facts or legal arrangements other factors might [also] give rise to such a dependence on the promoter or manager that exercise of control would be effectively precluded." 885 F.2d at 1460, citing *Williamson,* 645 F.2d at 424 n. 15.

ultimate reliance on the third factor in reversing the district court's summary judgment that the investment was not a security as a matter of law.

The promoters also seek to distinguish *Hocking* on the basis that it did not address a general partnership but involved a condominium purchase and rental pooling agreement. This second point is a distinction without a difference, running directly counter to *Howey*'s mandate that courts address "economic reality" rather than focusing on the labels attached to schemes by promoters. It is clear that the en banc panel in *Hocking* was addressing the third element of *Howey* and adopted *Williamson*'s approach as the appropriate framework for analyzing investor control. It is likewise clear that the en banc panel in *Hocking* did not view its application of *Howey* as limited to the condominium context; on the contrary, it cited to a number of general partnership cases (including *Matek*) in its discussion of *Howey*'s third element. 885 F.2d at 1460–61.

The promoters' arguments that *Hocking* does not affect the viability of *Matek* are unpersuasive. We therefore look to the en banc opinion in *Hocking* as the controlling law of this circuit and apply all three *Williamson* factors in evaluating whether the investors expected profits produced by the efforts of others so as to satisfy the third element of *Howey*.

2. Application of the Williamson/Hocking factors.

■ In determining whether the investors relied on the efforts of others, we look not only to the partnership agreement itself, but also to other documents structuring the investment, to promotional materials, to oral representations made by the promoters at the time of the investment, and to the practical possibility of the investors exercising the powers they possessed pursuant to the partnership agreements. *Hocking*, 885 F.2d at 1457. "[T]he question of an investor's control over his investment is decided in terms of practical as well as legal ability to control." *Id.* at 1460.

Assuming the disputed facts in favor of the nonmoving party (the investors), the investors were told from the outset that it was infeasible to farm jojoba in eighty-acre parcels and that the land owned by their partnership would be farmed as part of a 2700–acre plantation. They agreed from the outset to purchase irrigation, seeds, fertilizer and weedkiller from the promoters at specified prices. All 160 investors involved in the thirty-five partnerships agreed to hire the same on-site manager and were informed that the same two experts would be consulted regarding the planting. Most importantly, none of the investors knew anything about jojoba farming and, taking their allegations as true, none of them intended to engage actively in the business of jojoba farming. Rather, they relied substantially on the knowledge of the promoters and experts, and on the services to be provided by the on-site manager. Finally, it appears to be undisputed that jojoba farming was a relatively new undertaking in the United States, and that there were few individuals with expertise in the area.

The investors argue that all three *Williamson* factors tilt in favor of a finding that the investments here were securities. Because of the reliance of the individual partnerships on participation in the larger plantation, the investors contend that the power of the partnership is distributed as is the power in a limited partnership, thus implicating the first *Williamson* factor. The investors, however, are jumping ahead to the third factor and ignoring the crux of the first. It is clear from both *Williamson* itself and from *Hocking* that the first factor is addressed to the legal powers afforded the investor by the formal documents without regard to the practical impossibility of the investors invoking them. Here, the partnership agreement clearly affords the partners significant legal powers.

As a legal matter, the partners have the responsibility and authority to control every aspect of the jojoba cultivation process. Additional assessments of capital must be approved by 75 percent of the partnership

units; a majority of the partnership units can remove any person from a management position; decisions regarding the management and control of the business must be made by a majority vote.[12] The partnership agreements contain many provisions parallel to those in *Matek*, where the court found the powers vested in the partners sufficient to enable them to protect their investment, thus signifying that the investment was not a security. Like the condominium purchaser in *Hocking*, who was free to terminate the rental pooling agreement, occupy the unit himself, rent the unit out on his own, or sell the unit, the investors here could—theoretically, at least—vote to cease farming, replace the operating general partner, terminate services by the on-site manager, vote to interplant rows of alfalfa, etc. *Compare Howey*, 328 U.S. 293, 66 S.Ct. 1100 (orange grove investment gave the management company a leasehold interest and full and complete possession of the acreage, along with full discretion and authority over the cultivation, harvest and marketing of the crops such that investors had no right of entry to market the crop without the consent of the company). Under these facts, as in *Hocking*, the investors have not demonstrated that their partnership agreements leave them "with so little power as to place [them] in a position analogous to a limited partner." 885 F.2d at 1461. It therefore appears that the first *Williamson* factor tilts in favor of the promoters.

Under the second *Williamson* factor we consider the investors' sophistication and expertise. There were approximately 160 investors in the overall scheme (90 of whom are plaintiffs in this case). While it is undisputed that none of the investors had prior experience in jojoba farming, that draws the question too narrowly. Under *Williamson*, the relevant inquiry is whether "the partner or venturer is so inexperienced and unknowledgeable *in business affairs* that he is incapable of intelligently exercising his partnership or venture powers." 645 F.2d at 424 (emphasis added). Here, while the investors were doctors and dentists as opposed to business-people, all of them had at least $23,000 to invest in the venture and some had considerably more. The record indicates that some of the investors had prior experience in pistachio ventures and other tax shelters at the time of their investment. However, since the district court focused exclusively on the investors' formal status, the record is not fully developed on this issue and we simply have no basis for evaluating the sophistication of many of the investors. The question of the investors' expertise or lack thereof and its effect on their ability to exercise their powers intelligently is a question of fact which should be resolved in the first instance by the trial court. Since the record is insufficiently developed on this issue, we remand to the district court to determine whether the investors have raised a genuine issue of fact as to whether their lack of expertise prevented them from exercising meaningful control over their investment.

We turn finally to the third *Williamson* factor, which involves whether "the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers." 645 F.2d at 424. In this case, the investors' reliance on participation in the larger, 2700-acre jojoba plantation is analogous to, and arguably more extreme than, Hocking's reliance on the rental pooling agreement. In *Hocking*, the en banc panel noted that while the investor enjoyed complete legal control over his particular condominium unit, he

---

12. Although an investor participating in a general partnership obviously relinquishes some control since decisions must be made by majority vote, this type of diminution in control by itself would not satisfy the third prong of *Howey* unless the numbers of partners became so large "that a partnership vote would be more like a corporate vote, each partner's role having been diluted to the level of a single shareholder."

*Williamson*, 645 F.2d at 423. Such is not the case here. Even though each investor's absolute control is reduced by the voting structure, the general partners as a legal matter "do have the sort of influence [within the partnership] which generally provides them with access to important information and protection against a dependence on others." *Id.* at 422.

had made the investment in anticipation of receiving income from the rental pooling agreement, and in order for him to replace the management of that agreement he would have had to gain the votes of 75 percent of participating investors.[13] The court in *Hocking* held that "[those] facts alone create[d] a real question of whether Hocking was stuck with HCP as a rental manager." 885 F.2d at 1461. Because the rental pooling agreement resulted in the condominiums being managed as a resort hotel, and "[t]he commercial viability of a one-room hotel [did] not strongly argue for separate management," the court found that "[t]he individual investor may have [had] no choice but to place his condominium in the rental pool, if he [were] to receive significant rental income." *Id.* It thus reversed the district court's summary judgment that the investment was not a security.

Here, as in *Hocking*, there is a question of fact as to whether the investors could, as a practical matter, pull out of the larger enterprise and still receive the income they had contemplated when they made the investment. The promoters focus on the significant management powers and access to information afforded the general partners by the partnership agreements. The partnership agreement, however, only provides for the exercise of general partner control and decisionmaking *within* each partnership, and as to the land controlled by each partnership, not as to issues concerning the entire plantation. Likewise, the access to information provisions of the partnership agreement apply only to information related to the partnership and available to the partnership or the operating general partner. As discussed *supra*, however, actual farm management was not undertaken directly by the general partners on a partnership-by-partnership basis and the investors assert that they never intended to play an active role in managing the farming of jojoba. Rather, the thirty-five general

partnerships shared a common foreman, originally selected by promoter Hankins and later replaced by him, who oversaw the planting and management of the entire 2700–acre plantation.

As in *Hocking*, while the investors here could readily order the on-site manager to cease cultivating their particular plot,[14] it would be difficult if not impossible for an investor to affect the management of the plantation as a whole. There is not even a formalized mechanism in the partnership agreements for attempting to effect change on behalf of all thirty-five partnerships. Therefore, to replace the on-site manager for the entire plantation, an investor would have to catalyze a vote in each of the thirty-five partnerships (an endeavor which would be rendered difficult if not impossible by the fact that many of the investors did not even know the names of their own partners, much less have such information regarding the other thirty-four partnerships) and obtain the approval of a significant enough bloc of the partnerships to make it impracticable for the on-site manager to continue farming the remaining sections. In addition, the ready availability of alternative jojoba farm managers is more questionable than the availability of alternative realtors to manage a rental pool agreement in Hawaii, the situation presented in *Hocking*.

The fact that some investors were provided with detailed information about the status of their eighty acres and that some investors visited the land and even offered evaluations and suggestions to the on-site managers is not dispositive. *See Howey,* 328 U.S. 293, 296 n. 2, 66 S.Ct. 1100, 1101 n. 2 ("Some investors visited their particular plots annually, making suggestions as to care and cultivation, but without any legal rights in the matters."); *see also, Reeves v. Teuscher,* 881 F.2d 1495, 1499 (9th Cir. 1989) (although limited partners in real es-

---

**13.** There were approximately fifty other condominium owners participating in the rental pool agreement in *Hocking,* 885 F.2d at 1453.

**14.** As noted *supra,* note 7, there is some question as to whether such an order could or would

be implemented by the on-site manager. It may not even be possible to cease watering one-eighth of a section of land, or to apply herbicide to only three-eighths of a section.

tate development project "attended meetings and approved [the promoter's] plans," where "they testified that they relied on his expertise ... and only supplied the capital," the court found the investment to be a security within the meaning of *Howey*). Although the investors here possessed many of the same *legal* powers that the general partners did in *Matek* (where the panel applied only the first *Williamson* factor but stated in dicta that the investors did not implicate the other two factors in any event, 862 F.2d at 730-31, n. 15), the general partnerships' reliance on the larger plantation creates a practical situation clearly distinguishable from that in *Matek*—whch involved a single general partnership composed of twelve experienced businesspeople whose partnership decisions were able to affect the outcome of their investment. In this case, even if a general partner vigorously exercised his or her rights under the partnership agreement, he or she arguably could have no impact on the investment (other than to ensure its failure by withdrawing from the larger plantation).

Thus, the investors here have at least raised an issue of fact as to the necessity of participating in the 2700-acre plantation in order to produce income from the general partnership acreage, and as to their ability to affect decisionmaking regarding that larger plantation. They have not, as did the plaintiff-investors in *Williamson,* made only vague statements that they relied and were dependent upon the efforts of the promoters. 645 F.2d at 425. Having raised a genuine question as to the third *Williamson* factor, they likewise have created a genuine question for the trier of fact as to whether at the time of their investment they expected any profit to arise essentially through the efforts of others. *Howey,* 328 U.S. at 299, 66 S.Ct. at 1103. The district court's grant of summary judgment in favor of the promoters must therefore be reversed.

3. Investors' Additional Arguments.

We need not reach the investors' additional arguments that the investment constituted a security because the "general partnership agreement was purposefully drafted to escape the application of the securities laws," *see Matek,* 862 F.2d at 731, or that it constituted a security under the "risk capital" approach, *see Great W. Bank & Trust v. Kotz,* 532 F.2d 1252, 1257 (9th Cir.1976) (per curiam).

## CONCLUSION

We reverse the grant of summary judgment to the defendant-promoters and remand to the district court for further proceedings consistent with this order. The promoters' motions for sanctions based on the investors' alleged violations of Circuit Rules 28-2.8 and 30-1.2 are denied.