977 P.2d 826

**NUTEK INFORMATION SYSTEMS, INC., Jeffrey A. Shuken, Aks Daks Communications, Inc., Smr Advisory Group, L.C. and Albert Koenigsberg, Plaintiffs–Appellants,**

v.

**ARIZONA CORPORATION COMMISSION; Renz D. Jennings, Commissioner; Marcia Weeks, Commissioner and Carl J. Kunasek, Commissioner, Defendants–appellees.**

**No. 1 CA–CV 97–0590.**

Court of Appeals of Arizona, Division 1, Department E.

Nov. 5, 1998.

As Amended Nov. 10, 1998.

Review Denied May 25, 1999.

Law Practice of J.B. Grossman, P.A. by J.B. Grossman, Ft. Lauderdale, Florida and Roshka Heyman & DeWulf PLC by Paul J. Roshka, Randall H. Warner, Phoenix, for Plaintiffs–Appellants.

Grant Woods, Attorney General by W. Mark Sendrow, Assistant Attorney General, Robert A. Zumoff, Assistant Attorney General, Phoenix, for Defendants–Appellees.

Carol R. Goforth, Amicus Curiae Fayetteville, Arkansas and Lewis and Roca LLP by John P. Frank, Pamela B. Peterson, Phoenix, for Amicus Curiae.

## OPINION

RYAN, Judge.

¶ 1 The Arizona Corporation Commission ("Commission") found that appellants violated Arizona securities laws by marketing membership interests in limited liability com-

panies involved in telecommunications. This appeal challenges the Commission's conclusion that these interests constituted securities. We agree with the Commission and therefore affirm.

## I.

¶2 Appellant, SMR Advisory Group, L.C., ("SMR") is a Texas limited liability company. Appellant, AKS DAKS Communications, Inc., ("ADC") is a Florida corporation. Appellant, Albert Koenigsberg, ("Koenigsberg") is the president and member-owner of SMR and the president and sole shareholder of ADC.

¶3 In the spring of 1994, Koenigsberg began forming and marketing interests in numerous limited liability companies ("LLC") formed in Texas. LLCs are unincorporated entities that have some characteristics of a general partnership and some characteristics of a corporation. Under Texas' LLC laws, neither members nor managers are liable for the LLC's obligations. Tex.Rev.Civ. Stat. Ann. art. 1528n § 4.03(A) (West 1997). An LLC may be managed by its members or by a manager.[1]

¶4 The initial members of these LLCs consisted of SMR and individuals who owned 220–222 megahertz ("220 MHz") radio licenses from the Federal Communications Commission ("FCC"). The LLCs were organized to obtain licenses and construct, maintain, and operate five-channel 220 MHz dispatch communications systems. Appellants, Jeffrey Shuken ("Shuken") and his company, Nutek Information Systems, Inc., assisted Koenigsberg and SMR in soliciting additional members for these LLCs.

¶5 In telephone solicitations and written materials, appellants represented that the LLCs intended to enter into a cooperative operating relationship using compatible systems to form an integrated network, the Western Regional Network ("WRN"). The WRN would extend from Washington, south to California, and east into Nevada. Appellants claimed that the WRN would generate substantial revenue for the LLCs and provide services similar to cellular telephones.

¶6 On October 18, 1994, and again on November 7, Shuken spoke with Billy Oliverio, ("Oliverio") an investigator for the Arizona Corporation Commission. Shuken offered Oliverio an opportunity to invest in what he referred to as "Washington 220 Holdings, an L.L.C." Shuken later mailed Oliverio promotional offering materials similar to those sent to other prospective investors. The initial offering materials contained a signature page for the investor to reserve a specific number of units in a particular LLC at the offered rate per unit. Appellants instructed investors to make their checks payable to the particular LLC and remit them to SMR. Some, but not all, of the signature pages informed the investor that SMR would send a Membership Summary at some time in the future, and the investor would have seven days after receipt to request a refund. Appellants collected over $10.4 million from approximately 920 investors, including $147,500 from seventeen Arizona residents.

¶7 SMR combined the investors' funds into a single administrative account and used the funds to purchase communications equipment and pay other expenses. SMR then charged the expenses to the respective LLCs. Koenigsberg was the sole signatory on this account.

¶8 While the appellants were soliciting investors in 1994, each LLC entered into a System Management Agreement with the FCC licensee who was an original member. Under this agreement, the LLC agreed to construct the communications system, manage the system, and administer invoicing and collection of customer accounts. The licensee retained ultimate control over operation of the system. Koenigsberg signed these agreements on behalf of the LLCs as "managing member." In some cases, he did so before the LLC was formally organized.

¶9 During this same period, each LLC also entered into a System Construction and Management Agreement with SMR. Under these agreements, SMR would obtain access to a system by negotiating contracts with FCC licensees, construct a system, maintain

---

**1.** For more about this relatively new business entity, *see* Larry E. Ribstein & Robert R. Keatinge, *Ribstein and Keatinge on Limited Liability Companies* (1998); Robert R. Keatinge et al., *The Limited Liability Company: A Study of the Emerging Entity,* 47 Bus. Law. 378, 401 (1992).

and manage it, and collect and receive payments on customer accounts. The agreements recited that the licensees retained ultimate control. SMR was to receive as compensation 25 percent of gross operating revenues each month, with a minimum payment of $800 per month per channel ($4,000 per month for these five-channel systems). Each agreement lasted five years and contained a five-year renewal that could be refused by the LLC only if a court found SMR guilty of gross negligence or fraud. Koenigsberg executed the agreement on behalf of all entities: SMR, the LLCs as attorney in fact, and ADC as authorized agent.

¶ 10   On November 29, 1994, the Securities Division of the Arizona Corporation Commission initiated proceedings by filing a Notice of Opportunity for Hearing Regarding Proposed Order to Cease and Desist. The notice alleged violations of the registration and anti-fraud provisions of the Arizona Securities Act, Arizona Revised Statutes Annotated ("A.R.S.") sections 44–1801 to –2126.

¶ 11   In January 1995, the appellants sent the Membership Summary to investors who had previously reserved LLC units. This summary contained information on the following matters: risks; the relationship between the LLCs, ADC, and SMR; financial statements and organizational documents for the LLCs; and contractual arrangements between the LLCs, ADC, and SMR. It informed the investors that they could subscribe to the units previously reserved, or request a refund of the money they had already paid, but must do so within seven days. Appellants considered a failure to timely request a refund as consent to subscribe and a waiver of refund. A condition of subscribing required investors to ratify all prior acts of the LLC.

¶ 12   The Commission held a hearing in April 1995. It ruled that the membership interests marketed in the LLCs constituted securities and that the appellants had sold unregistered securities in violation of A.R.S. section 44–1841, failed to register as securities dealers or salesmen in violation of A.R.S. section 44–1842, and violated the anti-fraud provision, A.R.S. section 44–1991.

¶ 13   Appellants then filed this action, seeking judicial review of the Commission's decision. The superior court affirmed. Appellants appealed and we have jurisdiction. A.R.S. §§ 12–2101(B) and 12–913.

## II.

¶ 14   This case presents a question of first impression in Arizona.[2] We must decide whether the membership interests in the LLCs constitute "securities," bringing them under the Arizona securities laws. Whether an instrument is a security is a question of law. *Vairo v. Clayden*, 153 Ariz. 13, 18, 734 P.2d 110, 115 (App.1987); *Daggett v. Jackie Fine Arts, Inc.*, 152 Ariz. 559, 564, 733 P.2d 1142, 1147 (App.1986) (citing *United States v. Carman*, 577 F.2d 556, 562 (9th Cir.1978)). Our determination of the law, however, must be based on the facts determined by the factfinder—in this case the Commission. *See Carman*, 577 F.2d at 562 ("[T]he ultimate issue of whether or not a particular set of facts, as resolved by the factfinder, constitutes an investment contract is a question of law.").

¶ 15   In reviewing the facts determined by an administrative agency, we do not reweigh the evidence. *Carondelet Health Servs. v. Arizona Health Care Cost Containment Sys. Admin.*, 182 Ariz. 502, 504, 897 P.2d 1388, 1390 (App.1995). We decide if substantial evidence supports the administrative decision, and we uphold that decision unless the administrative agency

---

**2.**   We are aware of only one other case where this issue has been considered: *S.E.C. v. Parkersburg Wireless Ltd. Liability Corp.*, 991 F.Supp. 6 (D.D.C.1997) (holding that membership interests in wireless cable limited liability company constituted securities). However, there has been some debate among legal scholars. *Compare* Carol R. Goforth, *Why Limited Liability Company Membership Interests Should Not Be Treated as Securities and Possible Steps to Encourage this Result*, 45 HASTINGS L.J. 1223 (1994) (concluding that LLC interests should not be considered securities); Mark A. Sargent, *Are Limited Liability Company Interests Securities?*, 19 PEPP. L.REV. 1069 (1992) (same); *with* Marc I. Steinberg and Karen L. Conway, *The Limited Liability Company as a Security*, 19 PEPP. L.REV. 1105 (1992) (concluding that such interests should generally be considered securities).

acted illegally, arbitrarily, capriciously, or abused its discretion. *Id.*

■ ¶ 16 In Arizona, "security" is defined as:

> any note, stock, treasury stock, bond, commodity investment contract, commodity option, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas or other mineral rights, real property investment contract or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

A.R.S. § 44–1801(23). This definition is substantially similar to the definition of securities in both the Securities Act of 1933 and the Securities and Exchange Act of 1934. *See* Securities Act of 1933, 15 U.S.C.A. § 77(b)(a)(1) (1997); Securities Exchange Act of 1934, 15 U.S.C.A. § 78(c)(a)(10) (1997). Arizona courts therefore look to federal courts for guidance in interpreting the statute. *Vairo,* 153 Ariz. at 17, 734 P.2d at 114; *Rose v. Dobras,* 128 Ariz. 209, 211, 624 P.2d 887, 889 (App.1981). Here, we must determine whether the LLC membership interests constituted "investment contracts" under A.R.S. section 44–1801(23).

¶ 17 The Supreme Court has held that an investment contract is a security if a person (1) invests money (2) in a "common enterprise" and (3) is led to expect profits solely from the efforts of the promoter or a third

party. *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *accord Vairo,* 153 Ariz. at 17, 734 P.2d at 114; *Rose,* 128 Ariz. at 211, 624 P.2d at 889; *Daggett,* 152 Ariz. at 565, 733 P.2d at 1148. The Court has also noted that the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey,* 328 U.S. at 299, 66 S.Ct. 1100; *accord Rose,* 128 Ariz. at 212, 624 P.2d at 890. Thus, substance controls over form.

¶ 18 Here, the parties agree that the first two prongs of the *Howey* test are satisfied and contest only the third element of the test, whether investors were led to expect profits based solely on the efforts of another. We note first that *Howey*'s use of the term "solely" should not be taken literally. Rather, the third prong is satisfied if "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *S.E.C. v. Glenn W. Turner Enters. Inc.,* 474 F.2d 476, 482 (9th Cir.1973).[3]

¶ 19 The parties also agree that our analysis of the third prong should be guided by *Williamson v. Tucker,* 645 F.2d 404 (5th Cir.1981). [4] In *Williamson,* the Fifth Circuit addressed whether ownership interests in a general partnership (joint venture) could be considered securities. The court stated that usually general partners and joint venturers have enough control over their business entities that the third prong of the *Howey* test does not apply to them. *Id.* at 422–23. An investor who asserts that a general partnership interest constitutes an investment con-

---

**3.** *Accord Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 n. 4 (4th Cir.1988); *S.E.C. v. Professional Assocs.,* 731 F.2d 349, 357 (6th Cir.1984); *Goodwin v. Elkins & Co.,* 730 F.2d 99, 103 (3d Cir.1984); *S.E.C. v. Aqua–Sonic Prods. Corp.,* 687 F.2d 577, 582 (2d Cir.1982); *Kim v. Cochenour,* 687 F.2d 210, 213 n. 7 (7th Cir.1982); *Williamson v. Tucker,* 645 F.2d 404, 418 (5th Cir.1981); *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1040 n. 3 (10th Cir.1980); *Fargo Partners v. Dain Corp.,* 540 F.2d 912, 914–15 (8th Cir.1976); *see also International Bhd. of Teamsters, Chauffeurs,*

*Warehousemen & Helpers of America v. Daniel,* 439 U.S. 551, 558, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) (stating that economic reality governs, rather than form, in deciding what is a security); *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 848, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (same).

**4.** Without extensive analysis, the court in *Parkersburg Wireless* cited *Williamson* in support of its conclusion that the membership interests in LLCs were securities. 991 F.Supp. at 8.

tract and therefore a security "has a difficult burden to overcome." *Id.* at 424. However, the burden is not insurmountable:

It should be clear ... however, that the mere fact that an investment takes the form of a general partnership or joint venture does not inevitably insulate it from the reach of the federal securities laws. All of these cases presume that the investor-partner is not in fact dependent on the promoter or manager for the effective exercise of his partnership powers. If, for example, the partner has irrevocably delegated his powers, or is incapable of exercising them, or is so dependent on the particular expertise of the promoter or manager that he has no reasonable alternative to reliance on that person, then his partnership powers may be inadequate to protect him from the dependence on others which is implicit in an investment contract.

*Id.* at 422–23. *Williamson* requires us to look beyond corporate form to the substance of the transaction in deciding whether the securities laws apply to it. Thus, the securities laws will apply when the transaction prevents the partners from effectively exercising their partnership powers.

¶ 20 The *Williamson* court set forth three factors which could demonstrate that a general partnership interest was a security:

A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or

otherwise exercise meaningful partnership or venture powers.

*Id.* at 424. This list is not exhaustive; other factors may come into play.[5] Furthermore, these factors are not viewed in isolation; the transaction is considered as a whole. *Koch v. Hankins*, 928 F.2d 1471, 1476–78 (9th Cir. 1991). Applying these three criteria to the facts determined by the Commission, we conclude that the membership interests marketed by appellants constituted investment contracts, and therefore securities, under Arizona law.

■ ¶ 21 The Commission found that the agreements between the members, the LLCs, and ADC and SMR prevented members from exercising effective control over the LLCs. We agree.

¶ 22 In determining the level of investor control we look at both legal and practical control. *Id.* at 1478. We examine not only the formal agreement establishing the business enterprise (here, the LLCs' articles of organization), but also look to "other documents structuring the investment, to promotional materials, to oral representations made by the promoters at the time of the investment, and to the practical possibility of the investors exercising the powers they possessed pursuant to the [LLC] agreements." *Id.* "[R]eliance on others does not exist merely because the partners have chosen to hire another party to manage their investment." *Williamson*, 645 F.2d at 423.

¶ 23 Admittedly, the LLCs' articles of incorporation unambiguously provide that the member-investors had legal control. Indeed, they specifically state that "[t]he company is to be managed by its members." However, several factors worked against the members' ability to exercise effective control over the LLCs. First, the construction and management agreements turned over all principal management functions to SMR. These functions included location of FCC licenses and lease registration, initial construction of the

---

**5.** The court stated:
   These are the only factors relevant to the issue that are at all implicated by the facts of this case. But this is not to say that other factors could not also give rise to such a dependence on the promoter or manager that the

exercise of partnership powers would be effectively precluded.
*Williamson*, 645 F.2d at 424 n. 15; *see also Koch v. Hankins*, 928 F.2d 1471, 1477 n. 11 (9th Cir. 1991).

system, maintenance of the constructed system, account administration, entry into all other necessary contractual relationships to operate the system, and development and implementation of plans to operate the system.[6] The agreements also delegated the responsibility of collecting and accounting for customer receipts to SMR and gave SMR control over those receipts.

¶ 24   Moreover, the members had little or no input in deciding to enter into these agreements because the agreements were already in place before most members were recruited to invest in their respective LLCs. The investors were required, as a condition of being accepted as a member, to ratify all previous acts of the LLC.

¶ 25   Finally, as a practical matter, the large number (920) of geographically dispersed investors and LLCs diluted partnership power to such an extent that it prevented the members from exercising effective control of the business. *See S.E.C. v. Telecom Marketing, Inc.*, 888 F.Supp. 1160, 1166 (N.D.Ga.1995) (stating the "number of partnership units sold so dilutes each partner's power that in actuality it appears none could exercise any meaningful partnership control"). We recognize that the mere number of members alone does not dispose of the question. However, when the role of members amounts only to the power to approve the management efforts of a third party— precisely the proxy situation here[7]—the members are no different than shareholders. When taken together with the construction and management agreements, this situation ensured SMR would control the essential management functions that determined the failure or success of the LLCs. In effect, the transactions denied the members the legal control provided in the LLCs' articles of incorporation.

¶ 26   The Commission also found that the ordinary investor in this arrangement lacked the technical expertise to manage the LLCs and would therefore depend on the skills of SMR and Koenigsberg to manage them. With respect to this issue, both appellants and *amicus* argue that the second *Williamson* factor focuses on business acumen *generally*, and not on the specific enterprise in question. The Ninth Circuit has taken that approach. *See Koch*, 928 F.2d at 1479. However, the Fifth Circuit rejected this interpretation of its *Williamson* opinion:

> The test ... refers to the investor's experience in "business affairs," without referring to specialized knowledge. In *Williamson*, however, our discussion made clear that the knowledge inquiry must be tied to the nature of the underlying venture. 645 F.2d at 423. In finding that the general partners in *Williamson* possessed the experience and expertise necessary to exercise their partnership powers, we emphasized the partners' prior experience in similar real estate ventures. *Id.* at 425.... *Williamson* ... clearly requires that the investors' knowledge and experience be evaluated with reference to the nature of the underlying venture. Moreover, ... any holding to the contrary would be inconsistent with *Howey* itself.

*Long v. Shultz Cattle Co.*, 881 F.2d 129, 134 n. 3 (5th Cir.1989). Thus, *Long* interpreted *Williamson's* knowledge test as one requiring investors to have meaningful knowledge of the specific business being operated.

¶ 27   We adopt the Fifth Circuit's approach because we believe it better protects the intent behind the securities laws and takes account of the economic realities of the transaction. *See Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (stating cases involving securities

---

**6.** We do not attach too much significance to the fact that the agreements specifically prohibited SMR Advisory from undertaking the following actions: borrowing money; incurring debts; purchasing, selling, leasing, trading, exchanging, or otherwise disposing of LLC capital assets; making any FCC filings; and settling any legal action against the LLC. The other powers delegated to SMR Advisory appear to be the most significant ones as far as making the venture profitable.

**7.** The membership interests provided that certain actions taken by SMR required membership approval which was solicited by a proxy vote of the membership. The Commission held that "[t]he proxy votes provided to investors in the respective LLCs provided the investors with illusory control because the actual management and administration of the respective LLCs had been contracted to ADC and SMR."

should be decided on the basis of the economic realities of the transaction). *Williamson's* three factor test is ultimately aimed at determining whether a person has been led to expect profits on the basis of the efforts of another. An investor's knowledge of the business being operated provides one of the most reliable indicators of that investor's ability to exercise control over the investment. When the investor does not possess specialized knowledge of the business, he or she is far more likely to expect profits based on the efforts of the promoter or manager. The securities laws are designed to protect less-than-prudent investors from giving their money to irresponsible or unscrupulous businessmen. Because investors without specialized knowledge of the business must rely on third parties to manage their investments, they are precisely the vulnerable investors the securities laws are designed to protect.

¶ 28 In addition, our reading of some Arizona decisions indicates that our courts have implicitly adopted this logic. For example, the venture involved in *Daggett v. Jackie Fine Arts* was held to be a security in part because the plaintiff—who owned and operated a construction company—had no experience in the marketing of fine art. 152 Ariz. at 567, 733 P.2d at 1150. Similarly, in *Sullivan v. Metro Productions, Inc.*, the investment scheme for marketing a video-taped television show was held to be a security because the "investments were offered without regard to the experience or sophistication of the investors in the television industry." 150 Ariz. 573, 577, 724 P.2d 1242, 1246 (App. 1986). In short, just because one is a "business person" does not make him or her less reliant on the expertise of others when entering a new field of endeavor. We conclude that the second *Williamson* factor should focus on the individual investor's knowledge of the particular business being operated.

¶ 29 The evidence supports the Commission's decision that the investors did not possess the technical expertise to manage the LLCs. The Commission's expert, Dale Hatfield,[8] testified that an ordinary investor would have a "great deal of difficulty" in managing or operating the 220 MHz radio system. He further stated that it would have been hard for an investor to make informed decisions about some of the very technical issues involved. Hatfield also stated that any "network" idea would demand highly technical knowledge to coordinate and manage the system in terms of equipment, infrastructure, and operations. Finally, although a few investors had some experience in technical fields,[9] appellants did not contend that many or most of them had experience in running a dispatch radio communications business. Instead appellants argued that the members' ability to rely on one another's knowledge sufficed to satisfy *Williamson's* business knowledge requirement. We disagree.

¶ 30 First, to the extent such an argument relies on the expertise provided by SMR and Koenigsberg, it fails. If we were to so hold, a promoter could avoid the securities laws simply by buying some of what he was selling. Second, such an argument analogizes an LLC to a general partnership and relies on the "strong presumption that an interest in a *general* partnership is not a security." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 241 n. 7 (4th Cir.1988). However, an LLC is not a general partnership, and we decline to give it the strong presumption that it is not a security. While general partnerships and LLCs do have common traits, they are different enough to warrant different treatment. As one commentator noted:

The critical difference between LLCs and general partnerships is that the general partners' personal liability necessarily

8. The appellants argue that we should reject Hatfield's testimony because he lacked credibility. We reject this argument. In administrative appeals, the fact finder determines the credibility of witnesses, and we do not look over his shoulder. *See, e.g., Lathrop v. Arizona Bd. of Chiropractic Exam'rs*, 182 Ariz. 172, 181, 894 P.2d 715, 724 (App.1995); *Berenter v. Gallinger*, 173 Ariz. 75, 79, 839 P.2d 1120, 1124 (App.1992).

9. Mark Lidke, an investor who testified on behalf of the appellants, had a technical background: he had degrees in chemical engineering and electrical engineering. He had made previous investments in wireless cable television and specialized mobile radio businesses.

gives the partner an incentive to be highly informed about the business. At the same time, personal liability discourages involvement by unsophisticated investors. It follows that LLCs may have greater securities law exposure than general partnerships.

Robert R. Keatinge et al., *The Limited Liability Company: A Study of the Emerging Entity*, 47 BUS. LAW. 378, 404 (1992). Thus, the LLC member has less incentive to be informed about, or take an active role in, the business. This diminished incentive means the LLC members will actually be less likely to assist one another in the meaningful fashion anticipated by appellants. Given these inherent limitations in the LLC structure, we refuse to shift our analysis of investor knowledge from the individual to a group basis.

■ ¶ 31 The Commission also found that the investors in the LLCs were so dependent on the unique entrepreneurial and managerial abilities of Koenigsberg, ADC, and SMR, that they were incapable of replacing them as managers, or of exercising meaningful powers of control. The evidence supports the Commission's finding.

¶ 32 First, the construction and management agreements made it almost impossible to replace SMR as manager. Under the contracts, the LLCs hired SMR for a term of five years, with options to continue the contract for unspecified additional five-year terms. The LLCs could only prevent SMR from exercising its option "for gross negligence or fraud as may be determined by a court of competent jurisdiction." Thus, the investors not only had "no reasonable replacement" for their manager, they in effect had *no* replacement. *See Koch*, 928 F.2d at 1480–81 (holding manager was irreplaceable where investors had no practical ability to replace him).

¶ 33 Second, the same contracts that prevented investors from replacing SMR also prevented investors from exercising meaningful control over the LLCs. Because the contracts provided that SMR would manage system construction, FCC licensing, customer accounts, and other operations critical to the success of the business, the investors would be irretrievably bound to the management decisions of SMR. In other words, the investors could not exercise meaningful control over LLC business operations.

¶ 34 Finally, the investors relied on SMR's managerial skills to combine the LLCs into a network. The promotional materials heavily touted the WRN as one of the chief revenue sources for the LLCs. Only the centralized management of SMR could make the WRN a viable business operation. The members depended on SMR to coordinate both the technical and financial aspects of the operation. This situation is similar to that in *Howey*:

> The respondent companies are ... offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents. They are offering this opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products. Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment. Indeed, individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments.

328 U.S. at 299–300, 66 S.Ct. 1100; *accord Koch*, 928 F.2d at 1479–80 (although individuals investing in large-scale jojoba farm could technically replace their farm manager, it would not have been economical to do so); *Hocking v. Dubois*, 885 F.2d 1449, 1461 (9th Cir.1989) (similar, with reference to owners of individual condominium units in a resort). The *Koch* court summed up the difficulties faced by a hypothetical independent-minded individual in such a widespread endeavor:

> In this case, even if a general partner vigorously exercised his or her rights under the partnership agreement, he or she

arguably could have no impact on the investment (other than to ensure its failure by withdrawing from the larger plantation).

928 F.2d at 1481. By contrast, in cases where the manager had only ministerial duties, the investors could more easily replace the manager, or the enterprise was limited in size, the courts have tended to find the interests were not securities. *See, e.g., Holden v. Hagopian,* 978 F.2d 1115, 1122–23 (9th Cir.1992) (finding that manager could be fired at any time, "with or without cause"; reasonable replacements were available; lack of "pooling" of resources lessened the need for centralized management); *Rivanna Trawlers,* 840 F.2d at 242 (finding that investors could, and did, replace the managers).

¶ 35  Like the investors in *Howey,* the investors in this case could only achieve promised network profits from the coordinated management of the geographically dispersed LLCs. The construction and management contracts ratified by investors as a condition of membership stated that this coordinated management would be provided by SMR. Thus, to a large extent the financial success of the LLCs—as advertised to prospective investors—depended on the managerial skills only SMR could provide.

¶ 36  In sum, the evidence supported the Commission's findings that the *Williamson* factors had been met. The agreements between investors and the LLCs placed most of the managerial power in the hands of Koenigsberg, ADC, and SMR. Additionally, the highly technical nature of the 220 MHz radio-dispatch system ensured that few investors would possess the specific business knowledge necessary to make informed decisions about critical management functions. Finally, the construction and management contracts prevented SMR's removal as a manager and, when combined with the financial and technical issues, effectively prevented LLC members from exercising meaningful control over their investments. As a result, LLC members were dependent on the efforts of Koenigsberg, ADC, and SMR for the financial success of the business. Accordingly, the membership interests constituted investment contracts and were securities under A.R.S. section 44–1801(23).

¶ 37  In addition to arguing that the membership interests did not constitute securities, appellants argued that the evidence did not support the Commission's findings. To the extent these arguments address facts touching upon whether the membership interests constituted securities, we have already stated that the evidence supported the Commission's findings. Appellants also argued, however, that the evidence did not support the Commission's finding that appellants committed fraud under A.R.S. section 44–1991. We disagree.

¶ 38  To establish fraud, section 44–1991 required the Commission to find that appellants made untrue statements of material fact, omitted material facts, or engaged in transactions or business practices that operated as a fraud or deceit. The Commission made twelve specific findings meeting these criteria including that appellants: (1) had failed to inform investors of the risks before investing; (2) misrepresented 220 MHz radio as a "poor man's cellular;" (3) had touted the WRN as a profit source; and (4) had failed to inform investors of regulatory actions which could affect the value of the investment. Appellants take issue with these findings for various reasons.

¶ 39  Appellants first claim that the findings concerning the disclosure of the technical risks and the feasibility of the WRN rested on the Commission's expert Dale Hatfield, whose testimony appellants claim was unreliable. As noted earlier, we cannot reweigh the evidence or reassess the credibility of witnesses. *Carondelet Health Servs.,* 182 Ariz. at 504, 897 P.2d at 1390; *Berenter v. Gallinger,* 173 Ariz. 75, 79, 839 P.2d 1120, 1124 (App.1992). Thus, to the extent these findings rely on Hatfield's testimony they are adequately supported by the evidence.

¶ 40  Appellants also complain that the membership summary, provided to investors several months after their investment and shortly after the State filed its notice to cease and desist, adequately informed investors of the risks associated with the transaction. The evidence indicates otherwise. While it is true the summary described the substantial hurdles the LLCs would face before turning a profit, they did not correct the

earlier misrepresentations that induced the investors to invest. Most importantly, the summary still held out the idea of the WRN and likened the 220 MHz radio-dispatch to cellular phone communications.[10]

¶ 41 Finally, appellants complain that contradictory evidence was presented regarding the investors' knowledge of regulatory action occurring in other states. While this is true, we are bound by the fact finder's resolution of contradictory evidence. *See Berenter,* 173 Ariz. at 77, 839 P.2d at 1122 (declining to address appellant's arguments based on contradictory evidence). Accordingly, we hold that the Commission's finding that appellants committed fraud under A.R.S. section 44–1991 was adequately supported by the evidence.

### III.

¶ 42 We do not hold that a membership interest in any limited liability company constitutes a security; that question must be answered on a case-by-case basis. We do hold that the membership interests in the limited liability companies involved here were securities as defined by the Arizona securities laws. Therefore, we affirm the judgment.

THOMAS C. KLEINSCHMIDT, Judge and CECIL B. PATTERSON, Jr., Judge, concur.

---

10. Expert testimony at the hearing revealed the substantial differences between cellular service and the 220 MHz radio-dispatch system. 220 MHz radio is half-duplex, meaning only one person can talk at a time; while cellular service is full-duplex where both parties can speak at the same time. In addition, 220 MHz communications systems are more expensive than cellular systems because cellular companies subsidize the purchase of telephone equipment. Finally, at the time of investment, no portable cellular-like equipment was available to take advantage of the 220 MHz frequency range.