23 P.3d 92

Walter S. SIPORIN and Gerald L. Anchor, Plaintiffs–Appellants,

v.

Richard CARRINGTON, individually and dba Carrington Investment Service; Carrington Investment Service; and Carrington Estate Planning Services, Defendants–Appellees.

No. 1 CA–CV 00–0118.

Court of Appeals of Arizona, Division 1, Department E.

April 19, 2001.

As Amended May 10, 2001.

Lieberman, Dodge, Gerding, Kothe & Anderson, Ltd., by David D. Dodge and Marc R. Lieberman, Phoenix, Attorneys for Plaintiffs–Appellants.

Michael Salcido, PC, by Michael Salcido, Phoenix, Attorneys for Defendants–Appellees.

Janet A. Napolitano, Attorney General, by Cheryl T. Farson, Special Assistant Attorney General and Robert A. Zumoff, Assistant Attorney General Consumer Protection & Advocacy Section, Phoenix, Attorneys for Amicus Curiae Securities Division of the Arizona Corporation Commission.

## OPINION

GARBARINO, Presiding Judge.

■ ¶ 1 By legislative design, the Arizona Securities Act protects the public by preventing dishonest promoters from selling financial schemes to unwary investors who have little or no knowledge of the realistic likelihood of the success of their investments. We hold that the viatical settlement agreements sold to Walter S. Siporin and Gerald L. Anchor are "securities" for purposes of the Arizona Securities Act, Ariz.Rev.Stat. (A.R.S) § 44–1801(23) (Supp.1999). Siporin and Anchor are entitled to judgment on their claim that they were sold unregistered securities by unregistered dealers. They are, therefore, entitled to rescissionary relief.

¶ 2 Siporin and Anchor appeal from partial summary judgment dismissing their claims against Richard Carrington, Carrington Investment Service, and Carrington Estate Planning Services (collectively referred to as Carrington) for alleged violations of the Arizona Securities Act, A.R.S. sections 44–1801 through 44–2126 (1994 & Supp.2000). Appellants' securities claims are based on the theory that the viatical settlement agreements that Carrington sold them constituted "securities" within the meaning of A.R.S. section 44–1801(23) (Supp.1999), and that Appellants' purchases were subject to rescission under A.R.S. section 44–2001(A) (Supp.2000) because the securities were neither registered

with the Arizona Corporation Commission (Commission) nor sold by persons registered with the Commission as securities salesmen. *See* A.R.S. §§ 44–1841 (Supp.2000) and 44–1842 (1994). We agree.

## FACTUAL AND PROCEDURAL HISTORY

■ ¶ 3 "A viatical settlement is an investment contract pursuant to which an investor acquires an interest in the life insurance policy of a terminally ill person...."[1] *Sec. & Exch. Comm'n v. Life Partners, Inc.*, 87 F.3d 536, 537 (D.C.Cir.), *pet. for reh. en banc denied*, 102 F.3d 587 (D.C.Cir.1996). It is the sale of a terminally ill person's life insurance policy at a discount and provides the terminally ill person (viator) with a portion of the death benefit while he or she is still living. *Id.* Ultimately the purchase will yield a profit to the purchaser upon the viator's death that is equal to the difference between the death benefit paid by the insurer and the purchaser's total investment in the viatical settlement. *Id.* A purchaser's profit realization on a viatical settlement investment depends on the price paid for the policy and the amount of time that passes between the policy's purchase and the viator's death.

¶ 4 Carrington used advertisements and promotional materials to sell viatical settlement investments. Among the promotional materials were Carrington's brochures entitled "Win/Win Investing with Double–Digit Returns—The Viatical Settlement Story," and "Investment Process for Viatical Settlements." These brochures invited both prospective investors and prospective viators who wished to sell their life insurance policies to contact Carrington through local and national health service organizations. Viators who wished to sell their policies were required to grant Carrington access to their medical and insurance records. Carrington would thereafter contact each prospective vi-

---

1. The term "viatical" comes from the Latin word "viaticum" which is the Eucharist or communion given to Christians who are dying or are in danger of death; to the Romans, it meant money or provisions for a journey, but the term came to refer to last rites—something to sustain the deceased person on his or her "last journey." *See* **THE AMERICAN HERITAGE DICTIO-**

**NARY OF THE AMERICAN LANGUAGE** 1988 (3d ed.1996); *see also* David Jay Korn, *Viaticals: When Sooner Is Better Than Later*, **ACCT. TODAY**, Jan. 19, 1998 (for a description of the viatication process).

Miriam R. Albert, *The Future of Death Futures: Why Viatical Settlements Must Be Classified as Securities*, 19 Pace L.Rev. 345, 347 n. 8 (1999).

ator's physician to obtain an opinion about the prospective viator's state of mind and life expectancy. Carrington would then have its own physician or physicians review the medical history of each prospective viator and express an independent opinion on the prospective viator's life expectancy.

¶ 5 Carrington also evaluated the prospective viator's life insurance policy. Carrington required that the life insurer be a company with an A.M. Best rating of A or better, that the policy's two-year contestability period had expired, and that the policy permitted a redesignation of the beneficiary. Carrington also required that any current beneficiaries waive their rights.

¶ 6 The prospective investor in Carrington's viatical settlement program would enter into a Policy Purchase Agreement and an accompanying Agency Agreement and Special Power of Attorney. Under the Purchase Agreement, Carrington undertook to:

a. Review and qualify the applicants for Viatical Funding based upon underwriting criteria and other relevant guidelines, and provide medical and other pertinent information to the PURCHASER for review prior to purchase.

b. Forward to ESCROW AGENT the documents necessary to open the ESCROW ACCOUNT. . . .

c. Forward to the insurance company the documents necessary to register PURCHASER as IRREVOCABLE BENEFICIARIES of the policy(s) in accordance with PURCHASER'S ownership interest.

d. Instruct ESCROW AGENT to keep all premiums due on the policy current.

e. Apply on behalf of PURCHASER for the death benefit upon the demise of the insured.

2. Anchor's executed Policy Purchase Agreement applied to "24–48" month policies rather than "24–36" month policies.

3. Richard Carrington presented conflicting information about who would be responsible for premiums on a policy when the viator survived beyond 36 months. In his deposition, he testified that if premium payments exceeded the amounts his company retained to cover premiums, "my company would have to pay those

f. Supply PURCHASER on or about the anniversary date of purchase an updated medical summary of the insured (24–36[2] months policies only).

¶ 7 The investor deposits funds with an escrow service to be held until Carrington matches the investor with one or more life insurance policies. The money remains in escrow until "the policies [that the investors] have been placed into are funded and closed."

¶ 8 As part of the closing and funding process, Carrington would send a check to the viator's life insurance company in an amount equal to 36 months' premiums on the policy. According to Carrington's "Investment Process for Viatical Settlements," "[t]his insures the policy will stay active without possibility of lapsing."[3]

¶ 9 In the "Win/Win Investing" brochure, Carrington suggests returns of from 10% to 11% for policies in which the viator had a projected life expectancy of up to 12 months, to as high as 68% to 70% for policies in which the viator's projected life expectancy was up to 48 months. The brochure further advised that the amount of the return was "guaranteed," but that "the time frame for the payout of the death benefit is a variable and will affect the actual annualized rate of return. . . . Once the transaction has been completed, there is no liquidity for the investor until the insured dies."

¶ 10 During Richard Carrington's deposition, the following colloquy occurred:

Q. . . . Once the investor puts their [sic] money into Arizona Escrows, do you then have the discretion to draw down that money and purchase the life insurance contracts that you deem advisable?

premiums and that is what we have done." By affidavit, however, Mr. Carrington averred that no document obligated Carrington to pay policy premiums if the reserve ran out. He further averred that he "did **not** testify that the responsibility to make premium payments in such an event was Carrington's alone. Carrington has not foreclosed the possibility of asking the purchasers to make these payments to protect their investments."

A. Yes. That's what the power of attorney that our investors sign gives us the ability to do.

Q. So other than the discretion to invest or not invest, beyond that point the investors really don't have any control over the investments that Carrington makes for them?

A. Generally, no, we make that determination for them.

He further admitted that he understood that his investors were "basically relying upon Carrington's expertise in selecting the insurance company, the [prospective viators], and evaluating the medical information that's available to get them the highest possible return for their investment[.]"

¶ 11 Carrington did not consider the viatical settlement agreements to be securities and did not register them with the Commission. Neither Richard Carrington nor any of his employees were registered as securities dealers or salespersons with the Commission.

¶ 12 Anchor saw one of Carrington's advertisements and called Carrington's office. He later brought Siporin into the investment. In July 1997, they each signed Policy Purchase Agreements and they each deposited $100,000 with Arizona Escrow & Financial Corporation, Carrington's escrow agent.

¶ 13 In January 1999, Anchor and Siporin brought this action against Carrington. They amended their complaint to allege, among other things, claims for the sale of unregistered securities through unregistered salespersons. On cross-motions for partial summary judgment on Anchor's and Siporin's securities-based claims, the trial court ruled that the viatical settlements that Carrington sold them did not constitute "securities" within the meaning of A.R.S. section 44-1801(23) (Supp.1999). Siporin and Anchor appeal from the trial court's entry of partial summary judgment in Carrington's favor. We have jurisdiction pursuant to A.R.S. section 12-2101(B) (1994).

## STANDARD OF REVIEW

¶ 14 Whether an investment qualifies as a "security" under the Arizona Securities Act is a question of law. *See Vairo v.*

*Clayden,* 153 Ariz. 13, 18, 734 P.2d 110, 115 (App.1987). We review questions of law de novo. *State ex rel. Udall v. Superior Court,* 183 Ariz. 462, 464, 904 P.2d 1286, 1288 (App. 1995).

## DISCUSSION

I. *Interpretation and Analysis of Questions Arising Under the Arizona Securities Act*

¶ 15 When adopting the Arizona Securities Act, the legislature suggested its purpose and proper interpretation:

> The intent and purpose of this Act is for the protection of the public, the preservation of fair and equitable business practices, the suppression of fraudulent or deceptive practices in the sale or purchase of securities, and the prosecution of persons engaged in fraudulent or deceptive practices in the sale or purchase of securities. This Act shall not be given a narrow or restricted interpretation or construction, but shall be liberally construed as a remedial measure in order not to defeat the purpose thereof.

1951 Ariz. Sess. Laws ch. 18, § 20; *see also Rose v. Dobras,* 128 Ariz. 209, 212, 624 P.2d 887, 890 (App.1981); *Jackson v. Robertson,* 90 Ariz. 405, 409–10, 368 P.2d 645, 648 (1962) ("The Act is designed to be prophylactic if possible, remedial only if necessary.").

¶ 16 The Arizona Securities Act provides that securities may not be sold in Arizona unless a security is registered with the Arizona Corporation Commission. A.R.S. § 44–1841. Persons who sell securities in Arizona must be registered with the Commission as securities salespersons. A.R.S. § 44–1842. The purchaser of a security sold in Arizona in violation of either of these requirements may rescind the purchase and recover the amount paid for the security, with interest, reasonable attorneys' fees, and taxable court costs, less any income derived from owning the security. *See* A.R.S. § 44–2001(A) (Supp.2000).

¶ 17 During the period relevant to this appeal, the statutory definition of "security" did not expressly include viatical settlements.

*See* A.R.S. § 44–1801(23) (Supp.1999).[4] Accordingly, the relevant question is whether the viatical settlements sold by Carrington qualified as a security under the general category of "investment contract[s]" within the meaning of section 44–1801(23) (Supp. 1999).

¶ 18 The Arizona Securities Act definition of "security" is virtually the same as that contained in the federal Securities Act of 1933 and the Securities and Exchange Act of 1934. *See Nutek Info. Sys., Inc. v. Arizona Corp. Comm'n,* 194 Ariz. 104, 108, ¶ 16, 977 P.2d 826, 830 (App.1998), *cert. denied sub nom., AKS Daks Communications, Inc. v. Arizona Corp. Comm'n,* 528 U.S. 932, 120 S.Ct. 332, 145 L.Ed.2d 259 (1999). In interpreting the term "investment contract" in A.R.S. section 44–1801(23) (Supp.1999), Arizona looks to the federal courts for guidance. *Id.* We also give a liberal construction to the term "security." *Rose,* 128 Ariz. at 212, 624 P.2d at 890.

## II. *The Howey Test*

¶ 19 Following the holding of *Securities & Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), as interpreted and applied in *Securities & Exchange Commission v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 481–82 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), the federal courts have consistently determined that an "investment contract" arises whenever a person (1) invests money (2) in a common enterprise (3) with an expectation of profits from the efforts of others, and when such third-party efforts are "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Nutek,* 194 Ariz. at 108, ¶ 18, 977 P.2d at 830 (quoting *Glenn W. Turner*

*Enters.,* 474 F.2d at 482). Arizona courts have repeatedly applied the *Howey* test in resolving "investment contract" issues in Arizona Securities Act litigation. *See, e.g., id.; Vairo,* 153 Ariz. at 17–18, 734 P.2d at 114–15; *Daggett v. Jackie Fine Arts, Inc.,* 152 Ariz. 559, 565–68, 733 P.2d 1142, 1148–51 (App. 1986); *Sullivan v. Metro Prods., Inc.,* 150 Ariz. 573, 576–77, 724 P.2d 1242, 1245–46 (App.1986); *Rose,* 128 Ariz. at 212, 624 P.2d at 890.

¶ 20 Substance controls over form when determining whether a financial arrangement constitutes an investment contract because "the definition of a security 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.' " *Nutek,* 194 Ariz. at 108, ¶ 17, 977 P.2d at 830 (quoting *Howey,* 328 U.S. at 299, 66 S.Ct. 1100); *accord Rose,* 128 Ariz. at 212, 624 P.2d at 890.

## III. *Application of the Howey Test*

¶ 21 There is no dispute that Carrington's viatical settlement sales involved the investment of money in a common enterprise. When we apply the *Howey* test to this case, we focus on the importance given to Carrington's activities in analyzing the insurance policy and the viators' longevity. It becomes readily apparent that the success of the viatical settlement investment is based on Carrington's ability to correctly analyze the circumstances underlying the agreement.

¶ 22 It follows that the profits that Siporin and Anchor expected to realize depended almost entirely on Carrington's expertise in choosing which life insurance policies to purchase. This, in turn, depended entirely on

---

4. Subsection 23 provided:

"Security" means any note, stock, treasury stock, bond, commodity investment contract, commodity option, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fraction-

al undivided interest in oil, gas or other mineral rights, real property investment contract or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

Carrington's entrepreneurial and managerial skills.

¶ 23 In selecting life insurance policies to "viaticate," Carrington had to estimate the life expectancy of each prospective viator, which entailed reviewing medical records, gauging the truthfulness of the prospective viator's representation of his or her condition, and obtaining expert assistance to evaluate the prospective viator's medical condition. Carrington also had to review all potentially available medical treatments that might affect the prospective viator's life expectancy. More importantly, Carrington also obligated itself to investigate the prospective viator's life insurance policy to determine the actual death benefit payable and the likelihood that it would actually be paid in full. To do so, Carrington had to ensure that the policy was not contestable on any ground; that it was assignable; that it was not a group policy subject to cancellation with limited or nonexistent conversion rights; and that the insurance company's financial condition was such that it would be able to pay the death benefit when due.

¶ 24 Once Carrington had completed its analysis, it negotiated an advantageous price at which it would purchase the prospective viator's life insurance policy. Thereafter, Carrington marketed fractional interests in the policy to the general public, and it undertook premium payment and monitoring services to keep the policy in force and to timely claim the death benefit on behalf of the investors. Although it is the viator's death that ultimately yields a return, the profitability of the return depends almost exclusively on the viatical seller's entrepreneurial pre-closing investigations, analyses, and negotiations in selecting the viator and the policy and in setting the terms on which the policy is purchased.

■ ¶ 25 The success or failure of the enterprise rested with Carrington, its agents, and its employees, and not with the investors themselves. We conclude that the viatical settlement agreements marketed and sold by Carrington qualify under the *Howey* test as investment contracts and, therefore, are securities subject to the Arizona Securities Act. *See* Dave Luxenberg, *Why Viatical Settle-* *ments Constitute Investment Contracts Within the Meaning of the 1933 & 1934 Securities Acts,* 34 Willamette L.Rev. 357, 368–71 (1998) (arguing that viatical settlement agreements meet the *Howey* test because, among other things, the investor must rely solely on the seller of the investment).

¶ 26 Our search for existing authority to support this conclusion has revealed that the major appellate court decision in the United States to determine whether the sale of an interest in a viatical settlement agreement is the sale of a security arrives at a contrary conclusion. *See Life Partners,* 87 F.3d 536. In *Life Partners,* the Securities and Exchange Commission (SEC) argued that viatical settlements are investment contracts, and therefore securities, because investors' profits from the purchase of a viatical settlement agreement depend predominantly on the viatical seller's pre-purchase expertise in identifying prospective viators and on post-purchase management of the purchased life insurance policies. *Id.* at 545. Life Partners, Inc., the viatical seller, argued that its pre-purchase activities were irrelevant and that its post-purchase functions were merely ministerial and, therefore, that the investments it sold did not meet the third prong of the *Howey* test. *Id.* Life Partners, Inc. took the position that "once the transaction closes, the investors do not look to the efforts of others for their profits because the only variable affecting profits is the timing of the insured's death . . . ." *Id.* Life Partners, Inc. concluded that its viatical settlements were not investment contracts and, accordingly, were not securities under the 1933 and 1934 Acts. *Id.* at 538, 545.

¶ 27 The United States District Court for the District of Columbia agreed with the SEC and enjoined further viatical settlement sales. *Id.* at 538. In a two-to-one decision, however, the United States Court of Appeals for the District of Columbia Circuit reversed. *Id.* at 549. The court of appeals found that the SEC had identified no significant non-ministerial service that Life Partners, Inc. performed for investors after the sale of the viatical settlement interests, and that none of the post-purchase services had any material impact on investor profits. *Id.* Relying on

*Noa v. Key Futures, Inc.*, 638 F.2d 77 (9th Cir.1980), and *McCown v. Heidler*, 527 F.2d 204 (10th Cir.1975), the court of appeals determined that Life Partners, Inc.'s pre-purchase entrepreneurial functions had no legal significance. *Life Partners*, 87 F.3d at 546–47.

¶ 28 We disagree with the court of appeals' analysis in *Life Partners*. Although Arizona courts have consistently been guided by the federal courts' interpretation of the 1933 and 1934 federal Acts when applying the Arizona Securities Act, we will not defer to federal case law when, by doing so, we would be taking a position inconsistent with the policies embraced by our own legislature. We will depart from those federal decisions that do not advance the Arizona policy of protecting the public from unscrupulous investment promoters. *Life Partners* falls squarely within this category.

¶ 29 *Life Partners* disregards the premise underlying the *Howey* test—that is, that the statutory definition of "security" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299, 66 S.Ct. 1100. The *Life Partners* court acknowledged that the requirement in *Howey* that there be an expectation of profit "solely" from the efforts of others had given way to the more flexible and realistic rule developed in cases like *Glenn W. Turner Enterprises*. *Life Partners*, 87 F.3d at 545. Nevertheless, the *Life Partners* court imposed an even more inflexible bright-line rule. The majority concluded that pre-purchase managerial and entrepreneurial services, by themselves, are insufficient to support the conclusion that any profits realized are attributable to the promoter of the investment. *Id.* at 548; *see also* Albert, *supra* note 1, at 402–03. The rigidity of the *Life Partners* bright-line rule contravenes both the policy identified in *Howey* and our legislature's directive that the Arizona Securities Act "shall not be given a narrow or restricted interpretation or construction, but shall be liberally construed as a remedial

measure in order not to defeat the purpose thereof." 1951 Ariz. Sess. Laws ch. 18, § 20.

¶ 30 Neither *Howey* nor any federal securities decision lends anything more than tangential support for the bright-line rule set forth in *Life Partners*. The *Howey* test as evolved under *Glenn W. Turner Enterprises* and *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), is more consistent with the view that pre-investment entrepreneurial or managerial activities may satisfy the third prong of the *Howey* test under appropriate circumstances. Even *Life Partners* acknowledges that an "investment contract" entails " 'an investment in a common venture' with profits 'derived from the entrepreneurial or managerial efforts of others.' " 87 F.3d at 547–48 (quoting *Forman*, 421 U.S. at 852, 95 S.Ct. 2051).

¶ 31 Carrington sold interests in discounted life insurance policies along with services that were necessary for preserving invested capital and maximizing investors' rates of return. These services included Carrington's underwriting reviews of potential viators and their life insurance policies. Carrington sold these interests and the accompanying services as a single package. The extent to which each package would be profitable for the investor depended on the accuracy of Carrington's conclusions concerning the life expectancy of the viator, the terms of the insurance policy, and the financial soundness and reliability of the issuing insurance company.

¶ 32 The fact that Carrington's efforts preceded the sale of interests in viatical settlements to its investors does not change the nature of the investment. The pre-sale activities resulted in the determination that the viatical settlements that Carrington sold would be profitable. Indeed, no one disputes that Carrington's efforts were "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," as required by *Glenn W. Turner Enterprises*, 474 F.2d at 482. Under the *Howey* test, as here, the pre-sale activities were sufficient to classify the transaction as an investment contract.

¶ 33 We disagree with the statement in *Life Partners* that investors' profits from viatical settlements "depend[ ] entirely upon the mortality of the insured," 87 F.3d at 548, and, that in such a situation, a potential investor's "need for federal securities regulation is greatly diminished." *Id.* at 547. Viatical settlements are not like the items alleged to be securities in the cases upon which the *Life Partners* court relied. *See Noa*, 638 F.2d 77 (addressing the sale of bars of silver); *McCown*, 527 F.2d 204 (considering the sale of undeveloped land). The mortality of the viator is merely another factor to be considered when the seller assembles a viatical settlement agreement that will, the parties hope, be profitable for the investor upon the inevitable death of the viator. What truly determines viatical settlement profitability is the realization, over time, of an outcome predicted by the seller through its analyses of the viator's life expectancy, the soundness of the insurer, the actions needed to keep the policy in effect for the original face amount, and the insurer's unconditional liability under the policy's terms.

¶ 34 The definition of "security" found in former A.R.S. section 44–1801(23) (Supp. 1999) applies to many types of investments that derive their potential profitability from managerial and entrepreneurial skills employed prior to investor involvement. Among these investments are bonds, commodity investment contracts, commodity options, debentures, and fractional undivided interests in oil, gas, and other mineral ventures. The timing of the managerial effort and the investor involvement are not the only considerations. They are, however, significant considerations when determining if the purchaser is entitled to the protections of the Arizona Securities Act.

¶ 35 In sum, *Life Partners* adopts a convenient but inflexible and formalistic approach to the application of the 1933 and 1934 federal securities Acts. The *Life Partners* rationale does not serve the prophylactic and remedial purposes of the Arizona Securities Act. Therefore, we decline to follow it.

¶ 36 The Arizona legislature amended A.R.S. section 44–1801 to include "viatical or life settlement investment contract[s]" as securities under the Arizona Securities Act. 2000 Ariz. Sess. Laws ch. 108, § 2, effective July 18, 2000. We find it unnecessary to rehash the common debate in statutory interpretation cases concerning whether this amendment constituted a change in the law or a clarification of prior legislative intent. This amendment confirms, however, the long-standing policy of our legislature to protect the investing public.

¶ 37 We reject Carrington's argument that, because it relied on *Life Partners* in structuring its business, a repudiation of that decision would be fundamentally unfair. Carrington's claimed reliance on *Life Partners* was a calculated and voluntarily assumed business risk.

## CONCLUSION

¶ 38 We conclude as a matter of law that the viatical settlement agreements sold by Carrington meet all three prongs of the *Howey* test and, therefore, constitute investment contracts. Accordingly, their sale constitutes the sale of "securities" pursuant to A.R.S. section 44–1801(23) (Supp.1999).

¶ 39 We grant Appellants' request for attorneys' fees pursuant to A.R.S. sections 44–2001 (Supp.2000) and 44–2002 (Supp.2000) subject to their compliance with Rule 21(c) of the Arizona Rules of Civil Appellate Procedure. The trial court's judgment is reversed and the case is remanded to the trial court with directions that judgment be entered in favor of Appellants on their claims for violations of the Arizona Securities Act.

Concurring: BERCH and NOYES, Judges.