73 P.3d 631

**Jeremy E. SIMMS, Plaintiff–Appellee,**

v.

**Janet NAPOLITANO, Governor of Arizona; and Paul Bullis, Director of the Arizona Department of Gaming, Defendants–Appellants.**

**No. 1 CA–CV 02–0281.**

Court of Appeals of Arizona, Division 1, Department B.

Aug. 5, 2003.

Jennings, Strouss & Salmon, P.L.C. by Mr. Douglas Gerlach and Mr. Gerald W. Alston, Phoenix, Attorneys for Plaintiff–Appellee.

Lewis and Roca LLP by Mr. Frederick R. Petti and Ms. Patricia K. Norris, Phoenix, Attorneys for Defendants–Appellants.

Terry Goddard, Attorney General by Mr. Mark Brnovich, Phoenix, Attorney for Defendants–Appellants.

## OPINION

GEMMILL, Judge.

¶ 1 The Governor of Arizona and the Director of the Department of Gaming (collectively the "State") [1] appeal a trial court ruling prohibiting the Arizona Department of Gaming ("Department") from denying an applicant's request to withdraw his application for certification to provide gaming services. Because we conclude that the Department has the implied authority to deny such requests, we reverse.

¶ 2 Jeremy Simms, as a part owner of T.P. Racing, L.L.L.P., submitted an application for certification to the Arizona Department of Gaming to provide off-track betting services to several tribal gaming casinos. After several months of investigation, the Department advised Simms through a "Notice of Intent to Deny State Certification" ("Notice") that it intended to deny the application. The Notice summarized the investigation and expressed the Department's concern that Simms had been involved in questionable business practices, illegal activities, and financial dealings with a person purportedly involved in organized crime. The Notice also informed Simms that he had thirty days to appeal or it would become a "Final Order of the Department."

¶ 3 Simms appealed the Notice, and an administrative hearing was scheduled. Before the hearing occurred, Simms filed in superior court a complaint for special action and a motion for a preliminary injunction. He sought to prevent the Department from denying the license because it lacked authority to do so.[2] The complaint also alleged that the Department "declined to discontinue [its] efforts to deny Simms' license application, even after he has offered to withdraw it."

The State filed several motions to dismiss, and the trial court set a hearing.

¶ 4 At the hearing, the court questioned counsel and received argument regarding Simms' request to withdraw his application. At the conclusion of the hearing, the trial court deferred ruling on other issues and gave the parties additional time to brief the issue of withdrawal. The court also gave Simms additional time to submit a formal request to withdraw his license application. Shortly thereafter, the State offered to allow the withdrawal if Simms would agree not to re-apply. No such agreement was reached, however.

¶ 5 In its supplemental pleading on the withdrawal issue, the State argued that the Department had inherent power to deny a request to withdraw an application, because of its authority to certify gaming providers with the goal of excluding unsuitable individuals from Indian gaming. Simms argued that the Department exceeded its statutory authority over applicants because, in effect, his withdrawal made him a non-applicant and therefore the State had no power to proceed further.

¶ 6 The trial court concluded that the Department did not have the power to deny Simms' request to withdraw his application. The court reasoned that the Department's power derived from the gaming compact rather than from the State's exercise of police power and that the Department, therefore, did not have inherent power to deny such a request. The court commented that the Department's purpose was not only to deny the application but also to impose punitive sanctions that would prevent Simms from applying in Arizona or any other state.

¶ 7 The State's motion for new trial was denied and the trial court entered a final

1. Former Governor Jane Dee Hull and the former Director of the Department of Gaming, Stephen M. Hart, were originally named as defendants in their official capacities. In accordance with Arizona Rule of Civil Appellate Procedure 27(c)(1), their respective successors have been substituted as defendants.

2. Simms based his initial argument on the later-vacated federal court decision, *American Greyhound Racing, Inc. v. Hull*, 146 F.Supp.2d 1012

(D.Ariz.2001) *vacated by* 305 F.3d 1015 (9th Cir. 2002), in which the district court ruled that Arizona Revised Statutes ("A.R.S.") section 5–601(A) violated the non-delegation doctrine established in the Arizona Constitution. Simms argued that if the compact under which he was applying for certification was based on the invalid statute, the Department had no authority to take any action against him. The trial court did not reach this issue.

order enjoining the Department from denying or taking any further action on Simms' application.

## DISCUSSION

¶ 8 On appeal, the State reasserts that the Department's right to deny a request to withdraw an application springs from the State's police power, and specifically from the legislative authorization for the Department to certify gaming employees in order to ensure the exclusion of unsuitable persons from Indian gaming. The Department has, according to the State, an implied discretionary right to prevent withdrawal of an application as part of this mission. The State also urges that Simms improperly failed to exhaust all of his administrative remedies prior to seeking judicial relief. Simms, however, maintains that the Department exceeded its authority in continuing to deny the license application of a non-applicant and that the issue of exhausting administrative remedies was waived because it was not raised in the trial court.

■ ¶ 9 To resolve this dispute, we must interpret the scope of the Department's authority under the applicable statutes. Questions of statutory interpretation are legal issues that we review under a *de novo* standard. *Better Homes Constr. Inc. v. Goldwater*, 203 Ariz. 295, 299, ¶ 15, 53 P.3d 1139, 1143 (App.2002).

¶ 10 In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA"). One of its stated purposes is "to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences." 25 U.S.C. § 2702(2) (2000). Under the IGRA, Indian tribes may conduct certain types of gaming pursuant to a tribal-state compact. *See* 25 U.S.C. § 2710(d)(1)(C) (2000). The IGRA allows tribes to consent, through a tribal-state compact, to an extension of a state's jurisdiction and laws to gaming activities conducted on tribal lands. *Id.;* S.Rep. No. 100–446, at 5, 6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3075 (Statement of Policy). Congress has authorized the states to exercise their police power through tribal-state compacts to keep gaming

free from criminal elements and to protect the gaming public, while preserving tribal sovereignty. 25 U.S.C. § 2702; S.Rep. No. 100–446, at 2, 5, 1988 U.S.C.C.A.N. at 3071, 3075 (Background and Statement of Policy).

¶ 11 The State of Arizona, as authorized by the IGRA, has promulgated statutes for regulating Indian gaming and has entered into numerous tribal-state compacts. *See* Ariz. Rev.Stat. ("A.R.S.") § 5–601(D) (Supp.2000) ("The department of gaming is authorized to carry out the duties and responsibilities of the state gaming agency in compacts executed by the state and Indian tribes pursuant to the *Indian gaming regulatory act.*" (emphasis added)). The statutes, first enacted in 1992, give the Department authority to certify applicants who want to provide gaming services to tribal casinos under the tribal-state compacts. *See* A.R.S. §§ 5–601 to –602 (Supp.2000).

¶ 12 A foundational issue in this case is whether the Department's powers derive from the negotiated compact or from the State's police power. The trial court agreed with Simms that the Department's powers derived primarily from contractual rights negotiated in the gaming compacts, rather than the State's exercise of police power. *See* A.R.S. § 5–601(D) ("The department of gaming is authorized to carry out the duties and responsibilities of the state gaming agency *in compacts* executed by the state and Indian tribes . . . ." (emphasis added)). The trial court further concluded that these contractual rights did not give the Department any implied or inherent authority to deny a request to withdraw a license application. On this basis, the court distinguished cases where licensing authorities could deny a request to withdraw an application in order to discipline members of a profession and protect the public. Although we acknowledge the logic of such arguments, we disagree and conclude that the Department's authority derives from the State's police power.

■ ¶ 13 By enacting the IGRA, Congress gave the States—with federal oversight, *see* 25 U.S.C. § 2702(3) (2000), and tribal permission—the ability to exercise jurisdiction over gaming activities occurring on tribal lands.

Congress intended to allow state regulation while preserving tribal sovereignty. *See* 25 U.S.C. §§ 2701, 2702 (2000). The tribes are allowed to conduct certain types of gaming "only if such activities are ... conducted in conformance with a Tribal State compact." 25 U.S.C. 2710(d)(1)(C) (2000). And the IGRA expressly authorizes states to engage in licensing under provisions negotiated in the compacts. 25 U.S.C. 2710(d)(3)(C)(i) (2000). Congress decided that the States should administer this regulatory function, rather than have a federal licensing agency. Although the tribal-state compact is the mechanism through which regulation by the State is possible, we conclude that the regulating activities constitute an exercise of state police power and not merely an exercise of a contractual right. *See Dano v. Collins*, 166 Ariz. 322, 323, 802 P.2d 1021, 1022 (App.1990) ("The police power is an attribute of state sovereignty, and, within the limitation of state and federal constitutions, the state may, in its exercise, enact laws for the promotion of public safety, health, morals, and for the public welfare.").

¶ 14 Having concluded that the Department is exercising its police power when administering the licensing of gaming activities, we turn to whether the Department exceeded its authority by denying Simms' request to withdraw the application for certification. We conclude that the Department did not exceed its authority.

■ ¶ 15 The Department is a creature of statute and like other state agencies, is "created and maintained for the purpose of administering certain of the State's sovereign powers, and must proceed and act according to legislative authority as expressed or necessarily implied." *Allen v. Indus. Comm'n of Ariz.*, 152 Ariz. 405, 411, 733 P.2d 290, 296 (1987); *see also Pressley v. Indus. Comm'n,*

73 Ariz. 22, 31, 236 P.2d 1011, 1017 (1951) ("It has been settled in this state that the commission derives its powers from statute and therefore has no powers except those expressly conferred or necessarily implied in the law.").

■ ¶ 16 Building on the foundation provided by the IGRA, Arizona's statutes give the Department express authority to certify gaming providers with the goal of excluding unsuitable individuals from Indian gaming. *See* A.R.S. § 5–602(A) (Supp.2000). The Department is to conduct its duties in a manner "consistent with this state's desire to have extensive, thorough and fair regulation of Indian gaming." A.R.S. § 5–602(B) (Supp. 2000). Consistent with this mandate, the Department has been given specific authority to receive, for example, criminal background information on all applicants. A.R.S. § 5–602(D) (Supp.2000). The Department, however, is given discretion in determining how it will certify applicants. The statutes, consequently, confer broad authority on the Department to accomplish its statutory goals, and we conclude that the power to deny withdrawal of an application may fairly be implied from the governing statutes. This power is consistent with the overall regulatory aims of the IGRA and the Arizona statutes.[3]

¶ 17 Simms argues that the Department's power to deny a withdrawal is found nowhere in the statutes because after a person withdraws the application, he or she is no longer an "applicant." Simms also points out that the State has met its objective of deterring the unsuitable individual when the application is withdrawn. It is true that an applicant has been temporarily deterred when an application is withdrawn. The State has an interest, however, in proceeding to a final

---

**3.** In 2002 the legislature amended A.R.S. § 5–602(A) to add this sentence: "In carrying out the duties prescribed in this section, the department shall seek to promote the public welfare and public safety and shall seek to prevent corrupt influences from infiltrating Indian gaming." 2002 Ariz. Sess. Laws, ch. 111, § 1. We do not rest our decision on this new language because the amendment occurred after the events giving rise to this dispute. The amendment, however, clarifies and confirms our interpretation of the

pertinent statutes applicable in this dispute. *See City of Mesa v. Killingsworth*, 96 Ariz. 290, 297, 394 P.2d 410, 414 (1964) ("An amendment which, in effect, construes and clarifies a prior statute will be accepted as the legislative declaration of the original act." (citations omitted)); *see also Siporin v. Carrington*, 200 Ariz. 97, 104, ¶ 36, 23 P.3d 92, 99 (App.2001) (amendment of Arizona Securities Act confirmed long-standing policy of protecting the investing public).

denial in many cases because of the reciprocal information exchange conducted with tribal and other state gaming authorities. For example, under the tribal-state compact between the Fort McDowell Mohave Apache Indian Community and the State of Arizona, the Department is required to forward any certification denials to the tribal gaming authorities. States also can exchange such information by agreement to hinder unsuitable applicants from shopping around until perchance they slip through the screening process in this or some other jurisdiction. And the Department is authorized under tribal-state compacts to deny certification if it discovers that an applicant has had a license revoked or denied by any state or tribe in the United States. These provisions illustrate the importance of the Department proceeding to a final decision and having a formal denial on record. Allowing an applicant to avoid scrutiny of his or her background in other jurisdictions by simply withdrawing an application in this jurisdiction does not promote the federal policy of the IGRA to prevent corrupting influences in Indian gaming generally or the specific aims of the Arizona statutes to have thorough and fair regulation of gaming and to ward off unsuitable individuals. *See* A.R.S. § 5–602(A), (B) (Supp. 2000).

¶ 18 In reaching our decision, we find *Perry v. Medical Practice Board,* 169 Vt. 399, 737 A.2d 900, 904 (1999), instructive. The plaintiff in *Perry* applied to the Vermont medical board for a license. *Perry,* 737 A.2d at 902. He later requested leave to withdraw his application because he was moving out of state. *Id.* His request was denied. *Id.* The board then continued its investigation and uncovered some misrepresentations on the plaintiff's application. *Id.* The plaintiff appealed the board's decision denying his request to withdraw. *Id.* The Vermont Supreme Court observed that "the Board, as an administrative body, has only such powers as are expressly conferred upon it by the Legislature, together with such incidental powers expressly granted or necessarily implied as are necessary to the full exercise of those granted." *Id.* at 903 (quoting *Trybulski v. Bellows Falls Hydro–Electric Corp.,* 112 Vt. 1, 20 A.2d 117, 120 (1941)). The court then

found that the board's statutory authority to issue or deny the medical license carried with it the implied discretionary authority to deny a request to withdraw the application. *Id.* at 904.

¶ 19 The court in *Perry* reasoned that a licensee should not be allowed to escape discipline by resigning or allowing the license to expire.

> Otherwise, the licensee could apply for admission in another jurisdiction, or. subsequently reapply in the same jurisdiction, and maintain that he or she has never been disciplined for professional misconduct. This would patently defeat the underlying purposes of the regulatory scheme to protect the public and maintain the integrity of the profession.

*Id.* at 904. Applying these principles to the investigation into the background of the applicant, the *Perry* court stated:

> Where that investigation discloses substantial grounds for denial on the basis of false or fraudulent representations or immoral or dishonorable conduct, the safety of the public and the integrity of the profession may ... be better served by issuing a formal ruling, so that a decision of record would be available in this 'or any other jurisdiction where the applicant might subsequently apply.

*Id.*

¶ 20 The court noted that the underlying purpose of the regulations in *Perry* was for the protection of the public. *Id.* Moreover, the court reasoned that the regulatory scheme also gave rise to reciprocal duties owed to other licensing jurisdictions in reporting unsuitable applicants. *Id.* at 904–05. We believe that the same analysis and reasoning is applicable to demonstrate the Department's authority to deny Simms' attempted withdrawal of his application.

¶ 21 Although we recognize that the public safety concerns involved in regulating the medical profession differ from concerns regarding gambling, we also recognize that gambling attracts corruption and therefore requires a strong regulatory presence. *See Chance Mgmt., Inc. v. South Dakota,* 97 F.3d 1107, 1115 (8th Cir.1996) (Gambling "is gen-

erally understood to have a greater tendency to attract criminal infiltration than most other types of business enterprises."). Congress expressed this concern, stating that the IGRA's purpose is to "provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences." 25 U.S.C. § 2702(2) (2000). The Arizona statutes embody these concerns as well. *See supra* ¶ 16. Accordingly, we find *Perry* persuasive in its determination of implied powers and its recognition of reciprocal duties owed to other jurisdictions. Similarly, the Department's express powers coupled with the legislative mandate to protect the public support the conclusion that the Department can refuse to allow an applicant to withdraw his license application, especially when, as here, substantial investigation has already occurred and the proverbial handwriting is on the wall indicating a probable denial.

¶ 22 Simms cites *Saddlebrook Resorts, Inc. v. Wiregrass Ranch, Inc.*, 630 So.2d 1123 (Fla.Dist.Ct.App.1993) and *Humana of Florida, Inc. v. Department of Health and Rehabilitative Services*, 500 So.2d 186 (Fla.Dist. Ct.App.1986) for the proposition that an agency loses jurisdiction once an applicant withdraws an application for a license. We decline to adopt the reasoning of these cases.

¶ 23 In *Humana of Florida*, an intervening party sought to continue a formal administrative hearing after the original petitioner had voluntarily dismissed its petition. 500 So.2d at 187. The court concluded that the original petitioner could terminate the proceedings and divest the administrative agency of jurisdiction, even if the intervening party wished to continue. *Id.* at 188. The court stated that "where a petition is withdrawn, agency jurisdiction ceases to exist." *Id.* at 187. We find *Humana of Florida* distinguishable because the administrative agency did not challenge the original petitioner's withdrawal of its petition. Additionally, the analysis supporting the divestment of agency jurisdiction in *Humana of Florida* is based on another case in which the petition was withdrawn

before any agency action. *Id.* In our case, the Department had substantially completed the administrative review of Simms' application when he requested withdrawal.

¶ 24 We similarly find *Saddlebrook* inapplicable to this case. The court in *Saddlebrook* addressed whether an agency is divested of jurisdiction when a party other than the original applicant voluntarily dismisses its request for a formal hearing. 630 So.2d at 1125. Like *Humana of Florida*, *Saddlebrook* does not provide a persuasive analysis supporting the principle that Simms urges upon this court. We believe that *Perry* more soundly addresses the interpretation of similar legislative enactments and the issue whether an agency has the implied power to refuse to allow withdrawal of an application for a license.

¶ 25 Our conclusion is further supported by the following features in this case. First, Simms had notice that once he submitted his application, it could be withdrawn only with the Department's permission. In the instructions on page one of the application form, Simms was advised: "You are further advised that an application ... may not be withdrawn without the permission of the Department of Gaming." Simms' initials appear nearby on the form, indicating that he had read and understood the instructions. Simms argues that this provision is not backed by legal authority but is instead akin to an adhesive contract term. Because we have determined that the Department has the authority to deny withdrawal of an application, however, this provision is an appropriate notification to applicants that the application may not be withdrawn without the Department's permission.[4]

¶ 26 Additionally, the timing of Simms' attempted withdrawal was such that the Department had already conducted a full investigation, expending time and resources, in order to pursue its legislative mandate. Although we are aware that an applicant must pay a substantial fee for the Department's investigation, we are confident that the extensive investigation conducted by the De-

---

4. We need not address the potential issue whether Simms, by his apparent consent to this provision of the application, should be estopped to contest the Department's refusal to allow his withdrawal of the application.

**506**

partment on Simms' application represented an investment of administrative resources. Allowing an applicant to withdraw his application may create administrative inefficiencies that hinder the Department's effectiveness in meeting its statutory aims and invites the very kind of "license-hopping" that is contrary to the legislative intent and authorization. This court has previously interpreted contracting statutes to enable the Registrar of Contractors to prevent license-hopping by unscrupulous individuals in the contracting business. *See Better Homes Constr. Inc.*, 203 Ariz. at 300, ¶ 19, 53 P.3d at 1144. We similarly conclude here that the Department has the power to prevent the withdrawal of an application for gaming certification, when the Department determines in its discretion that the protection of the public is advanced by completing the certification process.

¶ 27 Because we find in favor of the State on the Department's power to prevent withdrawal of an application for gaming certification, we find it unnecessary to address the State's second argument that Simms failed to exhaust his administrative remedies prior to seeking relief in superior court.

### Conclusion

¶ 28 For these reasons, we reverse the judgment of the trial court, vacate the injunction, and remand the case for further proceedings consistent with this opinion.

CONCURRING: PHILIP HALL, Presiding Judge and LAWRENCE F. WINTHROP, Judge.